**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
Case No.: 09-20526-CIV-GOLD/McALILEY
Special Master – Thomas E. Scott

KLAUS HOFMANN,

     Plaintiff,

                            **CASE NO.:  09-20526-CIV-GOLD/MCALILEY**

v.

EMI RESORTS, INC., *et al.*,

     Defendants

_____/

AUREILO AGUILAR, *et al.*,

     Plaintiff,

                            **CASE NO.:  09-20657-CIV-GOLD/MCALILEY**

v.

EMI RESORTS, INC., *et al.*,

     Defendants.

_____/

## REPORT AND RECOMMENDATION
## FOLLOWING PRELIMINARY FORENSIC ANALYSIS

In accordance with the District Court's September 21, 2009 *Omnibus Order Regarding Report and Recommendations and Following Hearing* **[D.E. 714]**, the undersigned and the former Manager have undertaken a detailed (though preliminary) forensic analysis of the records obtained from the Elliott Defendants and other available information, as specifically ordered by the District Court.

I.    **Introduction**

A.    **Prefatory Remarks**

At the outset, it must be stated this task was and is an important one that the undersigned does not take lightly and the task has weighed heavily.  The matters and referrals set forth herein are of the most serious nature and they are the result of significant consideration, analysis and reconsideration.  At the apex of the concern is the unassailable fact that **thousands** of investors/owners, and by extension their families, (in the United States and Canada, as well as other countries) have been financially destroyed as a result of the actions by many of those named below.  Approximately $170 million was collected from investors/owners between the Juan Dolio and Cofresi projects.  That money has now been almost completely lost,[1] though it is the undersigned's belief that significant monies still remain, in offshore accounts still to be located and/or have been redistributed into other assets.

It was not only the hundreds of innocent plaintiffs in this action who were devastated, but also the additional thousands of people who were not directly a party to the lawsuits before this District Court.  These thousands of people have also lost their investments, in whatever form.  The innocent investors who are and/or were part of this lawsuit have little remaining financially, as has been set forth in the record, to continue the fight to recover their investments.  There are many more investors who have nothing available to fund a lawsuit to seek recovery.  The record is replete with letters to the District Court and the undersigned telling individual stories of how these individuals believe they were defrauded by the Elliotts Defendants (and those "related" to them) and/or James Catledge (and those "related" to him).  Each of these letters, as received, has been filed as part of the record in this matter.  These stories are not lost upon the undersigned or the District Court nor do they fall upon deaf ears.  The letters outline the degree of fraud that

---

[1] There is a possibility of some recovery from the potential sale of the Miches property.

occurred here.  Yet, these investors' stories do not result in the recommendations below; rather, the forensic analysis of the documents and materials beget the recommendations and referrals. The investors' plight is tragic.  The cause of that plight is criminal.  The main responsibility for that plight lay at the doorstep of a significant number of individuals and entities.  Secondary, but no less culpable, responsibility potentially lay at the doorstep of many others.

**B.**     **Documents and Materials Used in Forensic Analysis**

Part of the records and documents used for the undersigned's analysis were the Elliotts' own records, which were obtained in an electronic format (for the most part) directly from the Elliott Defendants during the Manager's tenure.  Additionally, for the purpose of preserving evidence, significant amounts of physical documents and other materials were removed from the corporate offices located at the Cofresi Resort at the Court's direction.  In compliance with the Court's September 16, 2009 *Order Affirming and Adopting Emergency Report and Recommendation Filed Under Seal, Dated September 16, 2009* **[D.E. 699]**, following consideration of the undersigned's Emergency Report and Recommendation **[D.E. 700]** (both were placed under seal), the Manager removed any and all documents, computers and similar materials that existed at the Cofresi Resort and which the Manager (following consultation with the undersigned) believed to contain sensitive or relevant information to the issues in this lawsuit.

Prior thereto, on September 2, 2009, the Manager at the undersigned's direction removed all available WWIN hardcopy documents and the billing invoices submitted by William Lambert and Gardiner Roberts for the purpose of preserving those materials.  The undersigned became concerned about these WWIN documents as they are implicated in what appears to include a money-laundering and/or tax evasion scheme.  Once these potential schemes became apparent,

coupled with the knowledge, based upon an earlier admission by Sarah Davies – that Ms. Davies (at least) undertook destruction of documents in or about March of 2009 – the undersigned removed the WWIN documents and invoices to ensure their safekeeping. Then, on September 16, 2009, when it became clear that the Cofresi Resort would absolutely be unable to survive,[2] the undersigned filed the Emergency Report and Recommendation under seal, seeking the Court's permission to remove **any and all** pertinent documents, computers, etc. from the corporate offices at the Cofresi Resort to protect and preserve such materials for future uses, such as evidence for the criminal and other various referrals referenced herein.

The Court authorized, *inter alia*, the removal of these documents and materials, payments relating to the same, payments for security of the Cofresi Resort, and authorization, *nunc pro tunc*, for the Special Master's wire-transfer of $106,994.71 from the Cofresi Resort bank account to the undersigned's trust account for safe-keeping.[3]

Additional information used in the forensic analysis was obtained both from within the court record and as provided by individual investors or those who were assisting them. As specifically ordered by the District Court [*see,* D.E. 718], the undersigned's office and the former Manager conducted a preliminary forensic analysis of the materials removed and otherwise available. That preliminary analysis is now complete.

Based upon the information, materials and documentation analyzed, there is a reasonable and good faith basis to recommend referrals of the individuals and entities discussed herein to

---

[2] The resort could not continue to survive if run on a legitimate and proper basis – the basis upon which the undersigned and the Manager, under the Court's direction and authority, attempted to operate since the appointment as Monitor on July 17, 2009 and the appointment of the Manager on August 6, 2009.

[3] The actions undertaken by the Special Master/Monitor and the Manager throughout their respective tenure were done with the consent, approval and direction of the District Court, normally following a report and recommendation. Examples, in addition to the document removal and money transfer, include the monies obtained from Re/Max [D.E. 619, 635, 647, 653], closure of the Cofresi Resort [D.E. 706 and 714] and payment of the undersigned's and Manager's expenses from the undersigned's trust account [D.E. 670, 679, 684, 738 and 744].

the appropriate authorities[4] for evaluation, further investigation and potential prosecution.  While the report below outlines certain matters more generally, and some more specifically, the reality is that not all the information (or the basis for the recommendation of referral) is reported herein.  There is enough and sufficient information available which establishes a reasonable and supportable conclusion that criminal activities have occurred and/or are still ongoing.  These activities need to be investigated and prosecuted and the proper redress needs to be meted out to those involved.

### C.    Summary of Findings

Per the Court's instruction, this report does not provide the explicit, detailed support for many of the statements which follow for reasons that pertain to:  (a) the protection of the undersigned's work product [*see*, D.E. 714]; and, (b) the release of too much of this information could possibly compromise any future criminal investigation.  There may well have been criminal RICO violations (as alleged by the Plaintiffs, though James Catledge, Impact, Impact-related entities and agents should also be included), securities violations under federal and state law, as applicable, fraudulent transfer of assets, theft (including through conversion of funds into real property, personal property, etc.), wire fraud, tax fraud, and money-laundering all facilitated through the initial development and operation of a Ponzi-scheme or a Ponzi-like scheme.[5]  These

---

[4] The appropriate authorities are: (1) the United States Department of Justice in Washington, D.C.; (2) the United States' Attorney's Office for the Southern District of Florida; (3) the Federal Bureau of Investigation (Miami Office); (4) the Attorney General for the State of Florida; (5) the United States Internal Revenue Service; (6) the United States Securities and Exchange Commission; and, (7) potentially other Attorney Generals in the various applicable states where individual victims may be located.  In addition, referrals should be made to the similar criminal authorities in Canada, the Dominican Republic and the Turks and Caicos Islands, as well as the appropriate licensing or bar associations in each of these jurisdictions in relation to the actions of the attorneys mentioned herein.

[5] The undersigned acknowledges that the Plaintiffs' original complaints filed in this matter (the separate Hofmann and Aguilar complaints) are, in large measure, factually correct based upon the information and documentation we have analyzed, with one major exception.  The allegations in both complaints omit any allegations against James Catledge and the Impact-related companies and agents.  Obviously, the Aguilar complaint contained no such allegations since James Catledge and certain Impact agents were part of that set of plaintiffs.  (Notably, on October 16, 2009, the Aguilar Plaintiffs filed an Amended Complaint, which they proceeded to voluntarily dismiss on

issues should be investigated and evaluated by the appropriate criminal authorities for potential prosecution.

As will be discussed below, the forensic analysis conducted thus far reveals a "two-tier" criminal enterprise. The first tier involves the Elliotts (and their companies, employees, agents and attorneys) and James Catledge (and his Impact-related entities, employees, agents and possibly attorneys) in the development, marketing and sales of fractional and/or timeshare units at Juan Dolio and Cofresi, which amounted to a Ponzi-style scheme and including the taking of exorbitant commissions, as discussed below. While it theoretically may have been possible to actually develop and complete the products which were sold in this first tier, even in the face of these commissions paid to Catledge (and his group) and the Elliotts, the events which make up the second tier caused the ruination of any hope for the products and plan (even if originally intended to be legitimate) to succeed.[6]

---

October 17, 2009.) Based upon our analysis, there are significant additional aspects to the stories set forth in the two complaints, which aspects relate to James Catledge's own involvement and culpability (and that of the Impact-related companies and agents) in the Ponzi-like scheme, as discussed below. However, from what can be confirmed at this time, and separate from the issue of the commissions paid, it does not appear that James Catledge was involved with the Elliotts' mismanagement and misappropriation of investor funds (stated otherwise, it does not appear that Mr. Catledge was involved in the second tier discussed herein. A question does remain about the Miches property and whether James Catledge was involved with the Elliotts' potential development of that property, including a golf course. He was involved in the beginning, at least, including staging an expensive presentation at the Miches site, accessed by private helicopters. However, nothing has been found, thus far, to show any present, ongoing connection between James Catledge and the Miches property.

[6] This is not to say that, but for the Elliotts' actions, what Catledge and his group did was proper or legal. Catledge and his group, along with the Elliotts, created, developed, marketed and sold a Ponzi-style scheme, bilking millions upon millions of dollars from investors. Rather, the point of the statement is that but for the Elliotts' intentional and fraudulent mismanagement of the remaining investor funds, the projects might actually have succeeded (assuming competent management—not the Elliotts—was in charge) and prevented the destruction of the investors' interests. In short, had the Elliotts not run amuck with abandon and instead actually used the remaining investor funds properly to try and make the projects work, the projects might very well have succeeded, at least with respect to the Juan Dolio project. Cofresi, however, might have been doomed nonetheless since, year after year, it was operating at an incredibly huge net loss (for a number of years the losses were in the millions of dollars). Any other legitimately run business would have closed years before. Without the additional monies from Juan Dolio investors (and, in comparatively smaller part, other bilked investors/owners in Cofresi), Cofresi would not have been able to pay for its ongoing operations (from incoming hotel revenue) and would have been forced to close years ago (absent some concerted action by the 1,600 to 1,700 shareholders, minus the shares held and controlled by the Elliotts and/or William Lambert).

The second tier relates solely to the Elliotts' (and their companies', employees', agents' and attorneys') mismanagement (at times, gross mismanagement, at other times fraudulent) and/or essential theft of investor monies. The second tier follows the payment of commissions to Catledge and the Elliotts, and their respective related entities. While the first tier is indeed egregious and caused significant harm to the investors, which allowed for the second tier to even exist, the events making up the second tier were the fatal blows to the investors.

The Elliotts purposefully created a sophisticated, complex structure of entities and ownership (as at least one email from the Elliotts admits) which even the most sophisticated Elliott insider would have trouble following without a "cheat sheet." The Elliotts wanted to be, and believed they were, judgment proof.[7]   The complex structure of entities was not accomplished by Fred and Derek Elliott alone, or even at their minimal creation or input. Rather, the Elliotts were assisted by highly sophisticated attorneys, in the Dominican Republic (i.e., DeMarchena Kaluche & Asociados, and possibly others) and in Canada (William Lambert and the law firm of Gardiner Roberts).[8]   In the undersigned's opinion, having reviewed the

,

---

[7] In August, 2008, Brent Goodrich of Net Worth Solutions (a Catledge-related company) wrote an email to Derek Elliott inquiring about proof of the Elliotts' ownership of the hotel/development (at Cofresi and Juan Dolio), and requested written confirmation of the same. In response, on August 15, 2008 Derek Elliott wrote, in pertinent part, as follows:

> I was in owners week meetings yesterday and I understand you did not get with Will.
>
> Of course Elliott entities own and control both hotels. This is obvious from our day to day occupation of our properties.
>
> However, on the advice of our legal counsel, William Lambert, we cannot provide you with detailed information on our ownership structure. The reason is that we have a complex structure designed to insulate these properties from claims and lawsuit. These companies are completely judgement proof. We are not able to provide details on the multi jurisdictional corporate and trust ownership structure without compromising this protection...

[8] There was/is also U.S. counsel for the Elliotts at Greenberg Traurig; however, the full extent of Greenberg's involvement is unknown other than the creation of certain contract and prospectus documents for the Juan Dolio and/or Cofresi products and legal advice and training regarding the same. The Elliotts dispute the extent of

materials in this case, there is no legitimate reason for the vast extent and nature of the structures created by the Elliotts and their complicit counsel, especially considering the unassailable fact that the Elliotts did not respect the separate corporate forms of these structures.[9]  The only purpose appears to be to create confusion and difficulty for investors and creditors to seek recourse for the Elliotts' (and their employees', agents' and attorneys') improper, possibly illegal, acts.

Through the complex web of entities, the Elliotts undertook what appears to have been a massive fraud and, essentially, a theft of investor monies.  If these efforts were not the original intention, they are indeed the end result.

The Elliotts were no strangers to the product sales at issue, as they engaged in such sales even prior the involvement of James Catledge and his Impact-related companies and agents. However, once Mr. Catledge and those at his direction became involved with the Elliotts, the enterprise simply took off to an entirely new level – a level which the Elliotts never before

---

Greenberg's involvement as set forth in the Elliotts' recent submission to the Court. See, D.E. 783 at pgs. 5-6. The undersigned does not necessarily accept the submission as accurate, and certainly the information in D.E. 783 does not appear to be written by either Fred or Derek, but at this time there is not sufficient information that the undersigned has been able to analyze which would dispute certain portions of what the Elliotts submitted regarding Greenberg.  That said, Greenberg and Rick Davis, Esq. should be considered for potential involvement in the underlying matters and additional information should be retrieved from Greenberg and others relating to said involvement.  The undersigned is aware that Greenberg and Mr. Davis are kept fully apprised of the ongoing matters in this case (including being copied on recent emails concerning the proposed FIG transaction), though the undersigned is not aware whether Mr. Davis and Greenberg are, or have been over the past months, counsel to the Elliotts or their companies.  Nonetheless, at one point the documents utilized by the Elliotts and Catledge to sell to investors (and which may have been prepared by Greenberg and Mr. Davis) state that the transaction is a securities transaction.  Therefore, likely after the Idaho experience, the documents were changed to remove the reference that the Sun Village Juan Dolio product/transaction was a securities transaction.  Greenberg and Mr. Davis were involved in this aspect as well based upon the information reviewed (and may have also defended the Elliotts in the Idaho action).

[9] While the Elliotts and their counsel may have followed the basic requirements for the corporations and limited liability companies set forth by whatever jurisdiction in which they were formed (e.g., Canada, Turks and Caicos Islands, the Dominican Republic, St. Vincent and the Grenadines, Gibraltar, etc.), the Elliotts transferred money and property between these various companies with impunity and most (if not all) of the time without proper and sufficient documentation and without proper collateral interests being taken in the receiving entities.  Funds were purposefully commingled (mostly by use of WWIN and CCW) making the Elliotts' efforts (to undertake whatever they wanted to do, personally or professionally) simpler and making the accounting for the flow of funds more difficult.

experienced, yet which they openly and happily embraced, at least for the first number of years while their coffers and pockets were filled until the situation turned for the worse.

However, the focus of this matter is not necessarily on what the Elliotts sold or did prior to their meeting and partnering with James Catledge,[10] but rather upon the events which occurred as a result of the Elliott/Catledge partnership.  It is this aspect which primarily matters for this case, as it is the one affecting those who are plaintiffs in this action.

The Elliott-Catledge relationship and "partnership" for selling real estate products (whether they were residences, fractional units or timeshares) at both the Juan Dolio and Cofresi properties generated significant amounts of money for which the investors have essentially received nothing[11] and who have now lost everything.   While the Elliotts continue to inappropriately blame the Special Master and the former Manager for the downfall of the Cofresi Resort (see, e.g., D.E. 775), attempting to deflect the Elliotts' years-long mismanagement and apparent theft of monies, the fact remains that the investors are left with nothing.  This fact is solely laid at the Elliotts' feet and is the result solely of their own doing.  The Juan Dolio property was foreclosed upon and sold at public auction on or about September 10, 2009, thus completely wiping out those who invested there.  The Cofresi Resort was foreclosed upon on October 7, 2009 and sold that day at auction[12] wiping out the Cofresi investors' interests.

---

[10] This information is relevant to counter the Elliotts' repeated proclamations that everything was James Catledge's fault and that they were also innocents who were taken advantage of by Catledge.  While the Elliotts have previously attempted to appear as if they were unsophisticated, they (or at least their counsel) are anything but unsophisticated.

[11] Some investors did receive Non-Use Fee ("NUF") payments for a period of time.  See chart below regarding total NUFs paid).

[12] The Cofresi Resort, however it was comprised for the purposes of the foreclosure and auction sale, was sold to a Spanish company called Globalia.  Globalia owns Air Europa and the Oasis chain of hotels, one of which is located in the Puerto Plata area.  What remains unexplained to date, however, is how and why the Bungalows were separately sold to Lifestyles (a neighboring resort property to the Cofresi resort), yet not a part of the foreclosure by Banco Leon and sale at auction to Globalia.  While we are still awaiting a translation of the Dominican Court's order (the Spanish version was received on October 20, 2009) regarding the foreclosure sale which should detail who the bidders were, to whom the property was sold and for how much, we have received reports and have seen a Dominican newspaper article, reporting the sale of the Cofresi Resort to Globalia for approximately $4.3 million.

It is essential to understand that even if a receivership was entered as soon as the Plaintiffs initially requested it in this matter the end-result would remain the same. Based upon the records and materials reviewed, it is beyond peradventure that even as of March 2009 it was already too late to save either the Juan Dolio or Cofresi projects from eventually being sent to foreclosure and sale, as both were too far along to the path of destruction to be helped.[13] Even as of early 2009, the Juan Dolio and Cofresi projects were too clenched in the jaws of defeat to be extricated. Moreover, the review of the records thus far reveals what appears to actually be an intention of the Elliotts and those "related" to them to cause such an insurmountable situation (irrespective of their protestations that they were trying to find their way out of this mess). For example, as discussed below and in various earlier Reports and Recommendations, when the Manager first came upon the scene at Cofresi, and after garnering information bit by bit in working with the Elliotts, it was learned that there were past-due trade payables exceeding approximately US$1,400,000.00 which were aged over four months.[14]

The Manager was appointed August 6, 2009. Thus, a great majority of the trade payables for the Cofresi Resort were unpaid since at least March/April 2009. *See also*, fn. 22, *infra*. Moreover, as it turns out, the Elliotts caused the Cofresi Resort (and the corporation which owned it) and themselves a problem with regard to the August 2008 $1,000,000 loan to Derek

---

The newspaper article reports that the Bungalows were sold to Lifestyles, though the amount is not disclosed, nor does the article discuss whether or not the Bungalows were part of the Banco Leon foreclosure and sale. From what we can tell based upon the Dominican Court's Order, the Bungalows were not a part of the foreclosure proceeding. Yet, the Bungalows were sold to Lifestyles. Accordingly, there remain open, important questions about who sold the Bungalows, whether that sale was a part of the Cofresi foreclosure and auction, and how much was received from the sale of the Bungalows and who received it.

[13] To be helped by way of *legitimate* means, not through the plans of the Elliott Defendants to continue to resell the same, or essentially the same, type of products previously sold to the investors. The model selling more and more units to be able to pay ongoing expenses, possibly not even making a dent into the true obligations, was a recipe for failure. The same model also relied upon the Elliotts' raising of money for one entity or project to be used to support other failing entities, or for separate purposes.

[14] The total amount of unpaid trade payables was much higher. This figure of US$1,400,000 (approximately RD$50,000,000) was only for the payables which were unpaid for at least four months or more. The total unpaid trade payables, at the time of the Manager's appointment equaled approximately US$2,600,000 (or RD$93,000,000).

Elliott from Alex Shnaider and Midland (i.e., the Trans-stahl loan as referenced in D.E. 706). Derek Elliott's failure to pay this loan resulted in the "need" to enter into an Amending Agreement in February 2009, whereby Derek proceeded to place the Cofresi Resort and holdings in the Miches property (purchased with Juan Dolio investor money) at a direct risk of loss. Even with that new agreement, the loan still was unpaid again going into default, causing even more serious issues and consequences in June 2009 as detailed in the September 18, 2009 Report and Recommendation and touched upon *infra*.

Between the two properties, the Elliotts and Catledge sold various real estate products (which in certain cases may be considered securities) for which approximately $170 million of investor funds were received. Yet, as of the closure of the Cofresi Resort, the Elliotts claimed under oath to have zero funds remaining. The Elliotts have been unable (or unwilling) to explain exactly what happened to the massive amounts of funds which were collected (minus the commissions paid).

The commissions paid out to Catledge, Elliott and/or their related entities, as well as total NUFs paid, were as follows:

| SALES COMMISSIONS | | | |
|---|---|---|---|
| SUN VILLAGE JUAN DOLIO & SUN VILLAGE COFRESI | | | |
| 2004-2009 | | | |
| | | | |
| | | | |
| **Paid To** | **Juan Dolio** | **Cofresi** | **Total** |
| **Catledge related parties** | | | |
| Impact America | $14,388,649 | $6,722,174 | $21,110,823 |
| D.R.C.I. | 15,092,268 | 4,612,584 | 19,704,852 |
| Impact Air | 271,809 | 5,988 | 277,797 |
| Dynamic Republic Program (A) | 397,558 | 566,797 | 964,355 |
| Cost Impact Group | 63,400 | | 63,400 |
| Commission on resales | 64,650 | | 64,650 |
| Power Millennium Real Estate | 7,322 | 20,766 | 28,088 |
| | 30,285,655 | 11,928,309 | 42,213,965 |
| | | | |
| | | | |
| **Elliott related parties** | | | |

| | | | |
|---|---:|---:|---:|
| EMI Resorts SVG | 5,506,493 | 7,378,804 | 12,885,297 |
| Drew Elliott | 225,550 | 155,998 | 381,548 |
| Tri Palms, Inc. (Drew) | 10,395 | 92,400 | 102,795 |
| 5% SVJD Residence sales | 2,689,901 | | 2,689,901 |
| | **8,432,339** | **7,627,202** | **16,059,541** |
| | | | |
| **Other** | | | |
| Aviance | 1,288,110 | 1,546,065 | 2,834,175 |
| D.S.I. | 370,919 | 501,264 | 872,183 |
| Net Wealth Navigator | | 16,880 | 16,880 |
| Other commissions | 151,693 | | 151,693 |
| Discounts on promissory note payments | 124,321 | | 124,321 |
| | **1,935,042** | **2,064,209** | **3,999,251** |
| | | | |
| | | | |
| **Non-use fees** | 6,802,751 | 5,265,630 | 12,068,382 |
| | | | |
| **Grand Total of payments:** | **47,455,788** | **26,885,351** | **74,341,139** |
| | | | |
| | | | |
| (A) Reimbursements to Catledge clients to fly them down to close. | | | |

It is imperative to find out what happened to the remaining funds (i.e., the total collected minus the total paid out in commissions and NUFs), where those funds are now or whatever is left of them, and/or what assets were obtained by use of those funds. It was relatively simple to account for the disposition of the above commission amounts (and the NUFs paid). The difficulty of the forensic accounting relates to the precise tracing of amounts which remained after paying all of the (exorbitant) commissions. The difficulty is presented mostly because of the Elliotts' (and their various lawyers' and agents') continual movement of monies, properties, and debt among their various related entities, and because of the extremely poor state of the Elliotts' and their companies' accounting records (so much so, it appears to be more by design than by incompetence).

As mentioned above, and to be clear, there are two tiers of potential criminality that occurred (and/or which continues to occur). The first tier involves the Elliotts (and their companies, employees, agents and attorneys) and James Catledge (and his Impact-related

entities, employees and agents) in the development, marketing and sales of fractional and/or timeshare units at Juan Dolio and Cofresi, which amounted to a Ponzi-type scheme (and taking of exorbitant commissions), as will be discussed below.  The second tier relates wholly to the Elliotts' (and their companies', employees', agents' and attorneys') mismanagement (at times, gross mismanagement, at others, fraudulent) and/or essential theft of investor monies, following the payment of commissions from the first tier.

Those two tiers are discussed below, followed by additional discussions relating to: (1) potential money laundering and tax evasion; (2) a list of all the parties and entities whom the undersigned recommends to be referred to the appropriate criminal authorities for evaluation, investigation and potential prosecution based upon the preliminary forensic analysis conducted; (3) a brief description of the documents which existed at the Cofresi Resort in the Elliotts' possession and what was removed, along with a description of the chain of custody; and, (4) further recommendations for materials to be produced by James Catledge and his associated entities and/or agents.

## II.     Potential Criminal Conduct – Two Tiers

### A.     First Tier – Ponzi Scheme – Juan Dolio and Cofresi sales

The most glaring finding of the preliminary forensic analysis is what appears to be a Ponzi scheme that was created by both the Elliotts and Catledge.  Though the scheme was developed jointly by both the Elliotts and James Catledge, Catledge was the driving force behind the "development" of the products to be sold and the ongoing marketing of those products to the investors.  The Elliotts, of course, were willing partners and had their own direct input, but Catledge was insistent that he was in primary control of the marketing and direction of how these products were sold to investors.  In fact, Catledge could not have been more clear that he was to

market and sell these products and the Elliotts should largely stay out of that aspect and focus solely on running the hotel side of their venture.  There are myriad documents supporting these points; however, those documents also demonstrate that the Elliotts (and their employees, agents and attorneys) were knowledgeable and willing parties to what was sold and how it was done. Moreover, it is beyond dispute that the Elliotts accepted the fruits of Mr. Catledge's (and his agents') labors.  Indeed, not only did the Elliotts accept the money, taking a handsome percentage for their own pockets, but they also approved, time and again, payments of massive, and at times increasing, commission percentages and other expense reimbursements to Catledge and the Impact-related entities.

With the above distinctions and hierarchy in mind, Catledge and the Elliotts were selling products which appear to have been actual securities, or which would fall under the purview of securities' laws.[15]  These products "guaranteed" the investors a certain yearly percentage of return on investment (the rate would range between 7% to 10%, paid quarterly) over a period of at least five (5) years, classifying that return as a "Non-Use Fee" or "NUF."  While there is dispute about whether the NUF was mandatory or optional and/or how that issue was directly represented to the investors, the fact remains, at least with the Juan Dolio property, that payment of a NUF is logically impossible since the property was not completed, there were no operations of a hotel and thus the NUF (as defined in the contracts) was non-existent.  Yet, for a significant period of time, the Elliotts paid these NUFs to investors.  The problem for the Elliotts and Catledge is that the money used to continue paying these NUFs (both at Cofresi and Juan Dolio) largely came from monies received from new investors.  They had to, since a fixed percentage

---

[15] Indeed, in at least one other jurisdiction – Idaho – the Elliotts and Catledge are still being pursued by the Idaho Attorney General's office.

rate of return was promised and there were no operations (Juan Dolio) or insufficient fund generation (Cofresi) to pay the investors at their promised fixed rate of return.

Nonetheless, the Elliotts paid the NUFs to certain investors for a period of time using funds generated from other new investors, and they continued until the economy started to slow (according to Fred Elliott's oft-repeated statement, it is the worst economy in 80 years). Though sales continued, they did eventually slow considerably and soon dissipated to minimal levels (comparatively speaking to the high levels during Catledge's involvement). As such, the Elliotts needed cash to pay ongoing obligations and without additional significant new sales, the needed cash was not forthcoming.

Yet, the Elliotts continued to try and sell product at the Juan Dolio. Moreover, they also allegedly "sold" to Inversiones Aviati, S.A. a significant portion of outstanding investor promissory notes, and Aviati threatened to "foreclose" on those notes unless they were paid. This was another continuing ruse of the Elliotts to generate more cash and to get out of the position of having to pay additional NUFs. Of course, the Elliotts to this day maintain that Aviati was an independent third-party. Aviati was not an independent third party. It was (and is) partly owned by Chery Jimenez, who is the same individual who was acting as the Elliotts' business consultant at the Cofresi Resort since about March, 2009. Supposedly, Aviati paid $450,000 for the approximate $14,000,000 in promissory notes at Juan Dolio (in a conversation with the Manager, Jimenez said Aviati paid over $650,000 in expenses on the Elliotts' behalf). Interestingly, Derek Elliott stated to Kip Rabin and Robert Rightmyer during the July 26 to 29, 2009 visit to the Cofresi Resort that they could get these notes back from Aviati without any problem as if there were no impediments of any sort to doing so (including there being no need to pay money to Aviati). Aviati's threat to foreclose on the Juan Dolio promissory notes was a

mere sham, and part and parcel to the Elliotts' racketeering. There is no presently available evidence to suggest that James Catledge was a part of this aspect of the enterprise, and indeed it likely occurred after the instant lawsuit was filed, in conjunction with the Elliotts' increasing need for cash.

However, prior to the above issue, and while Catledge was still involved, around the Summer of 2008 cash flows started to become tight and it was clear that the NUFs would no longer be able to be paid. To combat the rising cash problem, the Elliotts and Catledge came up with the idea of enticing the investors to convert their "Residence" product (essentially a timeshare) into the "Passport" product (essentially condo-type hotel ownership) which would liquidate the debt and eliminate the need for the Elliotts to continue paying the NUFs. Many investors did opt for the conversions offered. Although no cash was exchanged for these conversions, both Catledge and the Elliotts yet again paid themselves a commission percentage based upon the conversions. Thus, even more investor money was diverted to their respective personal coffers, when that money was desperately needed to complete the project.

It should also be mentioned that it is unclear whether the Elliotts ever held any true long-range intention of actually building the Juan Dolio hotel and bungalows. While they collected more than sufficient funds to pay off the bank mortgages immediately[16] and to construct the Juan Dolio property (the hotel already had the shell, it simply needed to be renovated), virtually nothing was constructed. Of course, the Elliotts have claimed (and/or those who work for them) that Juan Dolio was 60%, even up to 75%, complete. The undersigned did indeed visit the Juan Dolio property at the end of June 2009 and was told it was 75% complete, as was the Interim Manager when he visited in August 2009. It was nowhere near 75% complete. Regardless, the

---

[16] It is to be noted that only $4,000,000 in cash was needed to originally buy the property from the banks, and the remaining $8,750,000 was financing from the selling banks.

records show significant monies "spent" for construction at Juan Dolio, in the amount of $11,500,000 (it should also be noted there was a 3% override paid to EMI Resorts SVG, Inc. just for monies transferred to the Construction companies.) In addition, there were capitalized "soft costs" of $57,000,000 for commissions, NUFs and other expenses. Yet, no real significant construction occurred, most certainly nothing worth $11,500,000. This lack of accounting and tracing of funds is but one example of the Elliotts' mismanagement and/or theft of funds, which leads into the "second tier" of criminality and is discussed in the following section.

**B.  Second Tier – Intentional Mismanagement, Misappropriation and Theft of Funds/Assets**

After payment of all commissions to Elliott and Catledge (and their related entities) in addition to the NUFs which were paid, what happened to the remaining funds (approximately $96 million)? They certainly did not go to paying off the various bank mortgages. Some amounts were paid toward the mortgages, but quite obviously not enough.[17] A lot of money was used to pay for "soft costs" toward management fees, lawyers and so forth.[18] Then, of course,

---

[17] A serious question is why they were not. The Elliotts and Catledge collected millions and millions of dollars, yet the mortgages remained on the properties.

[18] With regard to the Elliotts' lawyers, even they claim not to be fully paid, yet they were at least being paid throughout this years-long adventure. As of September 2009, Enrique DeMarchena claimed that his firm was owed approximately $540,000. William Lambert of Gardiner Roberts, in documents we have reviewed, apparently claims that he and his firm are not fully paid. Yet, interestingly, Mr. Lambert (and the Gardiner Roberts law firm) seems to have obtained a preference over other "creditors." In a letter dated August 7, 2009 (which was provided to the Manager by Fred Elliott), Gardiner Roberts references a guarantee provided by Fred Elliott to Gardiner Roberts dated February 6, 2009. The guarantee is apparently secured by a mortgage granted by Fred Elliot in favor of Gardiner Roberts on Fred Elliott's property (or what earlier appeared to be Derek Elliott's) in Erin Township (identified by PIN 71139-0481 LT). Gardiner Roberts' August 7, 2009 letter continues to advise that the "parties whose performance was guaranteed" by Fred Elliott have failed to meet their obligations. Gardiner Roberts attached their July 20, 2009 demand letter to these entities (most of which Gardiner Roberts helped form or to whom they provided legal advice, and all of which involved Fred and/or Derek Elliott). Since the "demand" was not met, Gardiner Roberts informed Fred Elliott that if he did not pay CDN$800,000 on or before September 10, 2009, Gardiner Roberts would exercise its remedies pursuant to the mortgage. Yet, Gardiner Roberts and William Lambert continued to perform legal services for the Elliotts and to provide them with legal advice, all while purportedly foreclosing upon the mortgage on Fred Elliott's property. It is also interesting that there exists a "Letter of Direction" purportedly dated July 10, 2009, signed by Fred Elliott on behalf of EMI Resorts (S.V.G.), Inc. which ostensibly directs that any proceeds from the sale of the Miches property should go toward paying Gardiner Roberts and the Concepcion, Sexton & Martinez firm. According to the Letter of Direction, Gardiner Roberts is to be paid up to a maximum of $500,000 and the Concepcion firm is to be paid up to a maximum of $500,000 (for a total

there were the inter-company or inter-related loans.   While the Elliotts appear entirely comfortable with this as an acceptable practice, it was not acceptable in the manner in which they acted, nor should it be sanctioned.  These very practices ultimately led to the demise of the two properties and the loss of the investor funds.  These practices were especially egregious where investors provided money for a specific investment (which arguably were securities, in the manner they were marketed and the promises made to investors).  Yet, for example, instead of using that money for the purpose of actually constructing the Juan Dolio and/or fully paying off the bank mortgages, the Elliotts did such things as taking millions (approximately $7.5 million) from Juan Dolio investor monies – through the Elliotts' "intercompany loans" – to purchase an interest in the Miches property.[19]  The Juan Dolio investors received no interest in-kind for the Elliotts' use of their money for this undisclosed and unauthorized purpose.  Essentially, the Elliotts used Juan Dolio as their personal "piggy bank."  The Miches purchase did not benefit the Juan Dolio investors; rather, it solely benefitted the Elliotts personally (through EMI Resorts (S.V.G.), Inc.).  There are similar questions surrounding the source of funds for the Elliotts' (or their various companies) purchase of a part ownership interest in the Treasure Bluff property.[20]

---

aggregate of $1,000,000 to be paid to the law firms out of any Miches sale proceeds).  Yet, Gardiner Roberts complains about not being paid.  Gardiner Roberts and William Lambert should not only forego payment, they should be part of the target of the recommendation for criminal investigation and potential prosecution in the Ponzi scheme, money-laundering and potential securities violations, among other violations, as will be recommended below.

[19] According to Fred Elliott's deposition testimony, Miches was acquired for $22.5 million in July of 2006. However, the intention was to buy three parcels at $ 7.5 million each, but the Elliotts were only able to purchase one parcel on their own before Alex Shnaider got involved.  Subsequently, the second parcel was purchased with Alex Shnaider's money (another approximate $7.5 million) and Mr. Shnaider paid additional funds to hold the option on purchasing a third parcel of the Miches property.  From the Elliotts' side, part of the funds for the Miches purchase, approximately $7.5 million, was Juan Dolio investor monies, as testified to by Fred Elliott.  There is documentation as well which demonstrates that at least $7.5 million in Juan Dolio investor monies was used by the Elliotts to acquire their interest in Miches.  This $7.5 million was part of the overall $17 million removed from Juan Dolio investor monies as "intercompany loans" (those to which the Elliotts directly admit via Fred Elliott's deposition testimony and as found in the business plan originally submitted to the Court).

[20] Treasure Bluff is owned by Cofresco Holdings, Inc.  Cofresco Holdings, Inc. itself is owned 50% by EMI Cofresi Development a.k.a. Cofresi Developments, Inc. and 50% owned by "Carmor."  EMI Cofresi Development has 178 shareholders.  Carmor, upon information and belief, is Juan Carlos Morales, who is not necessarily associated with the Elliotts other than the Treasure Bluff property ownership.

Another example was the pervasive funneling of money from Juan Dolio sales and investors – again, the Elliotts called it intercompany loans, if booked at all – to support the operations of the Cofresi Resort. The Cofresi Resort was a veritable "money pit." From all of the records we have reviewed, the resort was never profitable, and in fact it lost millions of dollars per year over a number of years (the details of which are set forth in the records obtained).[21] Yet, somehow, the Cofresi Resort continued to operate. Obviously, it was not sustained by hotel operations alone. Instead, it took infusions of cash mostly from the Juan Dolio sales and investors, Cofresi sales of residences and fractional units and apparently certain other loans and deals engineered by the Elliotts (by way of example, but not by limitation, the Trans-Stahl transaction in August of 2008, with its attendant amendments in 2009, as detailed in a prior Report and Recommendation filed on September 18, 2009).[22]

Given more time and a more detailed forensic analysis, it would be wholly prudent to obtain detailed records from the Elliotts regarding all monies they received through management fees or through some other "entitlement," which monies were originally derived from investor funds. Then, with that information a comparison and accounting could be made of the assets owned by the Elliotts (or some company which they control), and when the assets were acquired (including any assets which have not heretofore been disclosed as required or which may otherwise be discovered).

---

[21] For example, an audit report by Ernst & Young, LLP for 2006 showed that EMI Sun Village, Inc. (i.e., Cofresi Resort) sustained net losses of over $6.57 million in 2006 and over $6.72 million in 2005, which was audited by another accounting firm. The accumulated losses through December 31, 2006 after all prior adjustments and reclassifications were approximately $24 million. The figures for 2007 and 2008 are not available as the Elliotts were in the process of obtaining audited financial statements. If those figures are needed, they can be provided, but the losses continued into 2007, 2008 and 2009.

[22] Even then, these additional massive infusions were insufficient to sustain the Resort. As of the time that the Resort was closed on September 18, 2009, the corporate payables (for the Elliotts' companies), not including the Resort trade payables, were approximately $41 million. Of that amount, the amount of loans payable (banks and intercompany loans) totaled approximately $30.3 million. The Resort's trade payables, near the end, were approximately $2.5 million (of which, at the beginning of the Manager's tenure, approximately $1.4 million in trade payables were unpaid for at least four months). The total taxes due for past TSS (social security) and VAT (sales) taxes equaled approximately $2 million and are not included in either of the above amounts.

For example, it would be important to determine the background behind Derek Elliott's purchase of the Erin Township property (Property Identification Number 71139 – 0474) on or about December 3, 2001 to the present date, including the $2,000,000 loan from WWIN International to Derek Elliott on or about October 25, 2002 (the documents filed with the land recording authority were prepared by "Will Lambert" at Gardiner Roberts and WWIN's address was provided as "in care of" Gardiner Roberts' address). There were various additional "transactions" relating to this property, including Derek Elliott's transfer on or about September 5, 2008 of the property to the Elliott-related company "Hillsburgh Stables, Inc" for zero dollars consideration. Additionally, on September 12, 2008 a "discharge" of the $2,000,000 loan from WWIN was recorded. There is no documentation submitted which shows how the Elliotts paid off the WWIN "loan" of $2,000,000, or how they otherwise received a discharge of the loan.

Then on February 26, 2009, William Lambert and Gardiner Roberts registered a charge/mortgage on the Erin Township property (now purportedly owned by Hillsburgh Stables Inc.) in the amount of CDN$800,000 with the balance due "on demand." The charge indicates that it is for "continuing collateral security for all debts and obligations due and owing presently or at any time or times in the future by Hillsburgh Stables, Inc. pursuant to a guarantee dated as of the date hereof." Interestingly, Gardiner Roberts' August 7, 2009 letter to Fred Elliott, advising of its intent to pursue the law firm's "rights" under the mortgage (i.e., foreclosure), attaches the firm's earlier July 20, 2009 letter with a list of outstanding files and matters for which payment was overdue. Not one of those matters listed relates to "Hillsburgh Stables, Inc." (at least, based upon the sparse descriptions provided by Gardiner Roberts). Rather, the majority of the work related to EMI Sun Village, Inc., Elliot Miches Holdings, Inc., Sun Village Juan Dolio, Inc. and such related matters. Thus, Gardiner Roberts' own recorded charge/mortgage

(i.e., collateral security for obligations due and owing by Hillsburgh Stables, Inc.) conflicts with what they seek to collect. Based upon what has been analyzed, this is not surprising, as the entire "debtor/creditor" relationship between the Elliotts and Gardiner Roberts and the attempt to appear legitimate is a mere charade, and a continuation of the Elliotts' and Lambert's attempts to spirit away funds and assets from the reach of the investors and creditors.[23]

The Elliotts' financial situation (and that of their investors) became worse once the lawsuit in this matter was filed, including the injunctions/embargoes filed by the Plaintiffs in the Dominican Republic, not because it ruined the Elliotts' legitimate business; rather, the lawsuit and injunctions started to put a stranglehold on the Elliotts' questionable activities.[24] The Elliotts complain that the embargoes caused the failures of Juan Dolio and Cofresi (though, most recently, the Elliotts are quick to point the finger at the undersigned and the former Manager).[25] Regardless, the fact is that the Elliotts were in deep trouble for quite a long time, which trouble started to surface around the Summer of 2008, and continued to worsen through 2009. What was abundantly clear once the former Manager was appointed and arrived in the Dominican Republic

---

[23] Moreover, it is somewhat odd that William Lambert and the Gardiner Roberts firm continued (and still continue) to represent the Elliotts when they apparently are owed so much money that they have liens on properties in Canada and an unrecorded Letter of Direction on proceeds from the potential Miches property sale. Even more disturbing, at least based upon the ethical rules governing attorneys and clients in the State of Florida, is that Mr. Lambert and his law firm are able to still represent the Elliotts even though they now take a significant adverse position against them or their interests – i.e., the threatened foreclosure on the CDN$800,000 "mortgage" on the Erin township property. It is possible that the ethical rules governing attorneys in Canada are vastly different, but assuming that they could not be that different on this point, such transactions further evidence the appearance that these various transactions between Lambert and the Elliotts are a mere sham designed to further alienate property and money from the reach of the Elliotts' creditors.

[24] The questionable activities referenced relate to the practice of using new investor money to pay for continuing operations at Cofresi. Even the Juan Dolio Owners' Week of recent past is an example. Certain letters from these recent Owners' Week investors revealed that the money generated was less of an intention (for some) by the Elliotts to actually help pay the Juan Dolio banks to save Juan Dolio from foreclosure, and more of an intention to raise funds for the Elliotts' ongoing legal fees.

[25] Notably, the Elliotts have yet to publicly accept full or significant blame, with the exception of their former counsel's statements at the beginning of the August 6, 2009 hearing and the September 11, 2009 webinar where Fred Elliott stated that the problems were only 30% due to the Elliotts' poor management, which is a vast understatement.

was that the Elliotts, for months prior to his arrival (approximately four months), were not paying numerous trade payables, taxes and so forth (including electricity for a time).[26]

As such, despite the millions of dollars received from investors over many years and the injection of those funds into the Cofresi Resort, the Resort failed miserably. This situation also left the Juan Dolio with no hope of salvation from foreclosure or that it would ever be completed despite the Elliotts' continued statements to the investors (through webinars, Owners' Weeks, etc.) that they (the Elliotts) would turn things around. The stated "intentions," hopes and even the business plan had virtually no chance of success, even if the businesses were legitimately run. The Elliotts wanted to be allowed to continue selling to generate cash (which would have simply meant more investors in the same lurch at the end of the road and all of them further diluted), which was the central concept of their business plan. The Juan Dolio money went somewhere, and it was not all burned up at Cofresi nor was all the money used to buy Miches, but none of it appears to be recoverable.

The undersigned does not believe **at all** that the Elliotts are without access to millions of dollars and in that regard a criminal investigation likely could reveal the existence and location of the millions of dollars that are not able to *presently* be located (without additional available resources for the undersigned to undertake such efforts). This inability to locate the assets is most likely due to the efforts of sophisticated legal counsel and other professionals who may have assisted the Elliotts with removal and hiding of the cash and/or other assets. To that end, if such attorneys and other professionals did engage in this conduct, they too are potentially guilty of significant crimes and at some level should be held to a greater punishment for knowingly facilitating these illegal actions which the Elliotts would not have been able to successfully undertake without the attorneys' and other professionals' deep and willful involvement.

---

[26] See fn. 22, *supra*.

Case 1:09-cv-20526-ASG   Document 832   Entered on FLSD Docket 11/12/2009   Page 23 of 50
*Report and Recommendation re EMI Operations Analysis*
*Page 23 of 50*

Yet, despite the fact that the Resort never operated profitably and lost millions of dollars each year, requiring money from Juan Dolio investors to continue, the Elliotts authorized payment to EMI Resorts, Inc. (their company) of a 5% management fee on the *gross* income of the Resort. In combination with the other actions discussed herein, this conduct by the Elliotts (and those assisting them and profiting from them) is possibly criminal and it should be thoroughly investigated and/or prosecuted. From the Juan Dolio investor monies, approximately $10 to $12 million of investor money was redirected, over the years, to pay for operations of Cofresi (including payment various management and other fees, which were essentially used by the Elliotts to pay themselves). Though Cofresi was not only failing to make a profit but actually losing millions of dollars each year (because of the Elliotts' own direct conduct), the Elliotts still paid themselves significant, unwarranted and undeserved management fees.

Also, as mentioned above, at least approximately $7.5 million of Juan Dolio investor money was redirected, either classified as an "advanced profit taking" or an "intercompany loan," to be used in part to acquire the Miches property (later with Alex Shnaider and Sellana). The Juan Dolio investors received no disclosure of this activity, nor any legally recognized interest in the Elliotts' interest in the Miches property.[27]

Other examples of the mismanagement, misappropriation and/or theft of Juan Dolio and/or Cofresi investor monies include but are not limited to:

1. Trans-Stahl personal loan to Derek Elliott and eventual encumbrance of EMI Sun Village, Inc. (see detailed discussion in September 18, 2009 *Report and Recommendation Regarding Cofresi Operations and Recommendation for Further Forensic Analysis* [D.E. 706]);[28]

---

[27] See fn. 19, *supra.*

[28] In recent filings, the Elliotts have proclaimed that the Trans-Stahl loan was not personal to Derek, but rather for the benefit of the Resort. The original agreement clearly shows otherwise. Nonetheless, instead of the $1,000,000 loan being transferred to a Resort account, the money was first transferred on August 28, 2008 by Midland to DMK's Citibank Trust Account (account number 3200647745). From the DMK Trust account, the monies were further distributed to CCW Dominicana, S.A. over the course of September and October 2008. The money was distributed from the DMK Trust account as follows:

Case 1:09-cv-20526-ASG   Document 832   Entered on FLSD Docket 11/12/2009   Page 24 of 50
Report and Recommendation re Ownership Analysis
Page 24 of 50

2.  Derek Elliott's gambling losses using investor money – money shuffled through WWIN and in some instances Derek asked Greg Clark to classify as "marketing expenses";

3.  Independence Yacht – purchased with investor monies purportedly for the purpose of entertaining potential new investors, but primarily used for the Elliotts' (mostly Derek's) personal use;

4.  Derek's and/or Fred's $2,000,000 loan/mortgage from WWIN on Canadian property (Erin Township) which was somehow "paid off," but no record of that money's source and use has been located. Additionally, there is at least $1,200,000 missing from the WWIN accounts;

5.  Inversiones Werden – false encumbrances to related or friendly party to attempt to get assets further out of reach from the hands of creditors, including the investors (whose money was used to purchase the Elliotts' interests in various assets in the first place);

6.  Management Agreement – used to take undeserved fees on the management of Cofresi despite repeated violations of its management agreement, among other conduct;

7.  The Elliotts' sale of at least one of the three Villas at Cofresi without proper reporting and disclosure to the other co-owners of the Villa. The remaining two Villas were encumbered to Werden (a clearly related/friendly party, despite the Elliotts' and Enrique DeMarchena's protestations otherwise).[29]

---

1.  September 2, 2008 - $800,000 transferred to CCW Dominicana, S.A. (account #731891594);
2.  September 3, 2008 - $20,000 paid to DMK lawyers;
3.  September 9, 2008 - $20,000 paid to "New Providence";
4.  September 9, 2008 - $1,500 paid to DMK lawyers;
5.  September 19, 2008 - $40,000 transferred to Inversiones Werden, S.A. for payment of loan interest Villa Santa Ponca y Mellesino;
6.  September 22, 2008 - $35,000 transferred to CCW Dominicana, S.A.;
7.  September 26, 2008 – Check for tickets to Panama for Coder & EDM for $2,000;
8.  September 30, 2008 – $40,000 transferred to CCW Dominicana, S.A.;
9.  October 6, 2008 - $22,000 transferred to CCW Dominicana, S.A.;
10. October 6, 2008 - $1,775 transferred to Panama BVI Corp.;
11. Bank charges for September - $277.10;
12. Bank charges for October - $277.75;
13. Bank charges for transfers - $228.50

Thus, it is clear that the full $1 million did not go to pay for the Resort's operations as the Elliotts proclaim. In fact, approximately $897,000 was transferred to CCW Dominican, S.A., which presumably was then used to inject cash into the Resort. Whatever, the case may be, the $1 million did not get transferred directly to a Resort account. Even if the funds were used by the Resort, the loan was still a personal one to Derek Elliott and to date the Elliotts have not explained why the $1 million was "suddenly" needed.

[29] Notably, at the hearing before the District Court on September 30, 2009, Mr. DeMarchena was directly asked if he knew who were the shareholders of Inversiones Werden. Mr. DeMarchena, without equivocation, stated that he had did not know. See, Transcript from September 30, 2009 hearing at pg. 30:11-12. According to a filing submitted by Plaintiffs' Counsel on October 12, 2009, two of the seven shareholders are members of DeMarchena Kaluche and Asoicados, one of whom is a partner in that firm. See, D.E. 774-1 (Sergio Olivio and Serge F. Olivio). Mr. DeMarchena cannot simply have been mistaken; rather, he was untruthful in his statements to the Court.

### III.   Potential Money-Laundering and Tax Evasion

WWIN International Ltd. is by all appearances a money-laundering vehicle and set up for the purpose of tax evasion, even if there may be some legitimate transactions and/or members "in the mix." WWIN's associated companies are CCW Dominicana, S.A. (and/or Continental Corporate Worldwide, Ltd.) and MPS, Ltd. CCW and MPS were essentially the check clearing companies for WWIN.

WWIN was largely operated by Greg Clark and Marija Stevanovic, both employees of the Elliotts, at all times material. WWIN assisted in the facilitation of the Ponzi scheme that related to the Juan Dolio and Cofresi sales and the resulting mismanagement and/or theft of investor monies. However, it was also used for additional matters by others, including Catledge and unrelated "investors" for their own illegal purposes.[30]

Upon information and belief, William Lambert was instrumental in assisting the Elliotts with the development of WWIN and its structure. It appears that WWIN was actually developed initially by Fred Elliott in Canada, likely with the assistance of Mr. Lambert. It was described as a check depository business to assist with clearing checks more timely than just depositing the checks in a Caribbean bank. However, from the information obtained and analyzed so far, WWIN appears to be more of a haven for individuals to deposit off-shore amounts and then use pre-paid Visa Electron cards issued by European and Belize banks to access those funds without drawing significant attention.

---

[30] Additionally, as reported by Phyllis Rispoli, in her October 13, 2009 correspondence to the Court (DE 782, pg. 3), she states as follows:

> It is noteworthy that the Impact Agent also informed me verbally (with other witnesses present) that rental income could be sent to an overseas account where there are no 1099 income reporting obligations. Holders could access these types of accounts through use of a debit card. I have no knowledge of such accounts or their existence other than this conversation.

This information should likely be referred to the United States Internal Revenue Service for further investigation and consideration. A significant portion of the records obtained from the Cofresi Resort consist of the remaining hard-copy documents for WWIN, electronic records relating to the WWIN accounts and a computer associated with the WWIN records.

WWIN was also supposedly utilized by Derek and/or Fred Elliott to provide a $2,000,000 mortgage for Derek Elliotts' Erin Township property in Canada. This mortgage was released in 2008 (as noted above), yet there are no readily available records to show: (a) the original mortgage and loan documentation; and (b) the payoff of the loan and the source of funds for the same. Also, as mentioned above, there is apparently $1,200,000 missing from the WWIN accounts, which are now all empty. Yet, according to the more recent balances in the QuickBooks files obtained by the Manager, there are still substantial balances reported in the WWIN accounts.

Catledge and/or his Impact people also utilized WWIN and CCW as part of the scheme for Juan Dolio and Cofresi. By memo dated June 1, 2006, Jerry Gerber of Impact Net Worth advised its agents that all checks for the sales at Juan Dolio and Cofresi were to be made payable as follows:

1. For the Residence product, all checks were to be made out to EMI SV;

2. For the Super Residence product, all checks were to be made out to EMI SV;

3. For the Preferred Passport product, all checks were to be made out to SVJD or CCW, Ltd.

Based upon the information available, it appears that just days prior to the June 1, 2006 memo, three (or more) Wells Fargo bank accounts were opened by Impact Net Worth.

Additionally, prior to opening the accounts on or about May 26, 2006, two Nevada limited liability companies were organized: (a) EMISV, LLC; and (b) SVJD, LLC. Also on May 26, 2006, a fictitious name certificate was sought and issued for SVJD, LLC granting it the fictitious name, "CCW LTD." The business mailing address for EMISV, LLC, SVJD, LLC and CCW LTD were all 1053 Whitney Ranch Drive, Henderson Nevada (which was the headquarters for Impact Net Worth and Catledge).

The May 26, 2006 filing for EMISV, LLC with the State of Nevada shows the two managers as Greg Clark (at the time, Elliotts' employee and CFO, despite the listing of his address as Impact's headquarters) and Jerome Gerber (Impact/Catledge). The May 26, 2006 filing for SVJD, LLC with the State of Nevada also shows both managers to be Greg Clark and Jerome Gerber. Finally, the May 26, 2006 Fictitious Name Certificate shows that CCW LTD. was owned by SVJD LLC and Jerome Gerber.

These May 26, 2006 filings and creations, under Nevada law, of EMISV, LLC and SVJD, LLC, as well as the fictitious name of CCW, LTD. for SVJD, LLC, coincide with the date that three Wells Fargo bank accounts were opened in Henderson, Nevada. Those bank account numbers are as follows (and each was the subject of an earlier Freeze Order entered by this District Court – See D.E. 576):

    a.      Account #278-2170696 – SVJD, LLC;

    b.      Account #278-2170704 – EMISV, LLC;

    c.      Account #278-2171025 – SVJD II, LLC or SVJD Trust[31]

---

[31] According to the answers to certain interrogatories provided by Wells Fargo in August, 2009 in the Utah federal court action (Case No. 2:08-cv-00812-CW-BCW in the United States District Court for the District of Utah), the signatories on Account #2782171025 were Gregory Clark and Marija Stevanovic, both former employees of the Elliotts. The records appear to indicate that Impact had one of the accounts for "their" use and the Elliotts had another account for the Elliotts' use, and the final account was the one actual operating (for lack of a better term) account into which the monies from investors were deposited.

There are reports, and documentation, stating that investors' checks were made out to one entity and deposited freely into the account supposedly owned by another entity. One example is a check provided by Fely Jamili and Paula Gustafson, and earlier filed as part of the court record (see D.E. 119), where Ms. Jamili wrote a check to "Sun Village Juan Dolio" for $100,546.88 on June 28, 2007. The reverse side of the check shows that it was deposited into account 2782170696 at Wells Fargo Bank in Henderson Nevada, owned by "SVJD, LLC DBA; CCW, LTD."[32]

As an important side note, Wells Fargo Bank should be investigated as well for even allowing this to happen so easily. Approximately the same day that these two Nevada corporations were formed (and the other fictitious name obtained), the bank accounts were allowed to be opened. Based upon the information before the undersigned, it does not appear that Wells Fargo complied with important, required federal statutes, including the PATRIOT Act.[33]

The above are only some examples of the evidence which exists to indicate that money-laundering likely occurred through WWIN, CCW and MPS, Ltd. and/or that other activities engaged in by both the Elliotts and Catledge (and their respective employees, agents and

---

[32] Obviously, an investor could be confused, since there was a Sun Village Juan Dolio, Inc. entity associated with the actual property and which was incorporated in Turks and Caicos Islands. The SVJD, LLC was arguably, and likely, designed to create confusion. CCW Dominican, S.A. is an actual corporation formed in the Dominican Republic, which the Elliotts used as part of the WWIN scheme, commonly referred to as CCW. Additionally, there was a Continental Corporate Worldwide, Ltd. which is a British Virgin Islands company, also used by the Elliotts with respect to Juan Dolio. However, the "CCW, Ltd." found on the back of Ms. Jamili's check is the fictitious name sought and obtained in Nevada on May 26, 2006 by both Jerome Gerber (Impact/Catledge) and Greg Clark (on behalf of the Elliotts). These investors, such as Ms. Jamili, were writing checks for the purchase of real estate products at Sun Village Juan Dolio in the Dominican Republic. The Wells Fargo accounts and the Nevada corporations that owned them had no direct link to the actual Juan Dolio property or the actual corporations that owned (and could thus sell) the real estate products at Juan Dolio. The Nevada corporation names were confusingly similar by design.

[33] Based solely upon anecdotal information, Mr. Catledge and his companies were a very good client of Wells Fargo Bank, in Henderson, Nevada which may explain (though, still inappropriate) why these accounts were so easily opened with few, if any, questions asked or a proper inquiry being made.

attorneys on their behalf) amounted to tax evasion activities, and they further caused, or assisted, others to engage in such activities.

## IV.   Parties and Entities to be Referred, Investigated and Potentially Prosecuted for Criminal Activity and Violations or other Improprieties[34]

Following the preliminary forensic analysis[35] and extensive consideration of who should or should not be included in any referral to the appropriate authorities, the following list is provided, as broken down between:  (a) "Elliott – related parties;" (b) "Catledge – related parties;" (c) parties related to both Elliott and Catledge; and (d) parties not *directly* related to either Elliott or Catledge.[36]   These individuals and entities should at least be evaluated and investigated by the appropriate criminal authorities[37] for potential criminal prosecution:

### A.   Elliott-related parties for Referral to the Appropriate Authorities

#### 1.   Individuals and Entities with a direct relation to Elliotts

---

[34] The list of people and entities to refer to the appropriate authorities of the United States and/or various state governments, and foreign governments for evaluation and potential prosecution is different from a list of potential defendants in the civil case.  Simply because a party might have some potential civil liability does not mean that they must share criminal liability, though further evidence may ensnare some additional defendants.  Thus, if a particular individual or entity is not named in this report, the failure to include them does not indicate that the omitted individual or entity may not share some manner of civil liability.  Additionally, the failure to include a party or entity in the list below does not indicate that there are no others who should be part of a criminal probe and prosecution; rather, it simply means that sufficient evidence, to provide a good faith and reasonable basis for a criminal (or other) referral, does not exist in the undersigned's possession and/or has not been analyzed to date.  It is likely that others will be revealed as part of any further forensic analysis or criminal investigation and it is likely that additional evidence will be obtained.

[35] Parts of such analysis (in general) are discussed in the preceding pages of this report.

[36] Some additional commentary is provided below certain names.  This additional commentary is not intended to be an exclusive discussion of the issues relating to that particular name; rather, it is provided to **illustrate** some **examples** of the particular individual's or entity's involvement, or some comments which may be relevant to the criminal authorities.  The lack of any additional commentary or narrative does not indicate the non-existence of any or additional pertinent information.  Instead, comment is simply not provided in this report.

[37] Such authorities include: (1) the United States Department of Justice in Washington, D.C.; (2) the United States Attorney's Office for the Southern District of Florida; (3) the Federal Bureau of Investigation (Miami Office); (4) the United States Internal Revenue Service; (5) the United States Securities and Exchange Commission; (6) the Florida Attorney General's Office; and, (7) possibly the Attorney Generals of other applicable states (where harm was done to particular investors), in the event they wish to undertake proceedings against those listed in this report.  This matter should additionally be referred to the appropriate criminal authorities in Canada, the Dominican Republic and the Turks and Caicos Islands, as well as the appropriate licensing authorities and/or bar associations in these jurisdictions where the referenced attorneys are licensed and practice.

| Individual or Entity | Additional Comments (if any) |
|---|---|
| | |
| Frederick Charles Elliott | - Initially developed WWIN in Canada.<br>- Ownership in other Elliott-related companies[38] with money from other sources;<br>- Money missing from WWIN. Upon information received, approximately $1.2 million was missing from WWIN owners/clients. The actual WWIN accounts are empty, yet the accounting (in QuickBooks) shows substantial balances in existence;<br>- Insisted on transferring monies throughout Elliott-related companies without regard to the source and ownership of funds. Rather than deposits from the sales of units into their respective bank accounts, the CCW accounts were used as an overall "piggy bank" and money distributed where and as needed;<br>- Complicit in Ponzi scheme – approved the concept and payment of "non-use fees" when there was no "use" of the properties to derive such payments. The term was utilized as if it was being paid from operations, when, in fact, there were no operations to pay them. Several documents indicate the "guaranteed" returns (ranging from 7 to 10% over a period of five years.) (In earlier years (1999-2001) paid a return on investment when there were no earnings to pay out). The whole concept is almost classic Ponzi scheme. Fred also actively participated in the marketing shows and presentations throughout the U.S., Canada and Mexico generating new clients and using the materials and concepts primarily created by Catledge.<br>- Sale, or other encumbrance or transfer, of the villas at Cofresi without proper reporting. |
| Derek Frederick Charles Elliott | - Some points listed above for Fred Elliott also apply to Derek;<br>- WWIN – even more than his father, Derek used the WWIN monies for his personal use and also paid himself and his companies unreasonable compensation for the poor services provided;<br>- Personal ownership in other Elliott-related companies with money from other sources (including, for example, Miches and Mellesino);<br>- Obtained a mortgage "from" WWIN for $2 million on the Erin Township property (discussed above); documentation so far is lacking, as is the documentation relating to the payment of the mortgage such that it was discharged and the source of funds used to do so; in addition to Derek's transfer of the Erin Township property to his father's company, Hillsburgh Stables, Inc., which in turn Fred Elliott provided a guarantee and Gardiner Roberts took out a mortgage on the Erin Township property to cover fees of CDN$800,000 purportedly owed to Gardiner Roberts;<br>- Executive commission, especially those paid on the conversions (see schedule of commissions above). This issue applies to Fred as well. The Elliotts, through EMI Resorts (S.V.G.), Inc. took commissions on the conversions even though no cash changed hands. It would have reduced the non-use fees had they continued to be paid;<br>- Gambling advances paid from CCW. While Derek did provide details of his gambling advances through WWIN/CCW, those details do not agree |

---

[38] The numerous entities owned or controlled by the Elliotts were or appeared to be, at all times material, mere alter egos of Fred and/or Derek Elliott. The corporate forms were not truly respected in the sense that the Elliotts, and those at their direction, including certain of their lawyers, employees and agents, used these various corporations as one collective "piggy-bank" (as alleged by the Plaintiffs). Funds were indeed taken indiscriminately, or at least whimsically, from one company to pay the obligations of another. On such occasions, these types of transactions were recorded (if at all) as an "intercompany loan" or something of that nature.

| Individual or Entity | Additional Comments (if any) |
|---|---|
| | with information separately received by the Manager; |
| | • Other personal amounts/advances taken from HSV Operadora (hotel account), CCW and WWIN. The total amount is significant. |
| | • Insisted on transferring monies throughout the Elliott-related companies without regard to source and ownership of funds (similar to Fred); |
| | • Complicit in the Ponzi scheme (similar to Fred). In addition, Derek appeared to be more closely associated with Catledge than Fred and was more heavily involved in the planning and methodology of the fund-raising, resultant commissions and conversion structure. Derek additionally approved all payments to Catledge, including the ever-increasing commissions; |
| | • Transferred numerous assets including Cofresi Cove, at least two Villas, and apartments, to Inversiones Werden, a company incorporated by Enrique DeMarchena and which has as two of its shareholders an associate and a partner at the DeMarchena Kaluche & Asociados firm. Upon information received, their "transfer" to Werden ostensibly shows that it occurred in or about January 2009, but the information received indicates that the transaction actually occurred in June or July 2009 and was back-dated to January 2009 by the Elliotts and the DMK firm (and/or DeMarchena). DeMarchena's firm, and possibly others, were involved with these Werden transfers; |
| | • Through Derek, the Treasure Bluff property (funds for the purchase of the Elliotts' interest appear to have come from investor money) was used as collateral for another loan of $650,000 without the consent of the other owner of Treasure Bluff (Juan Carlos Morales); |
| | • Derek, along with his father (but mostly Derek), grossly and/or intentionally mismanaged (for own personal gain) the operations of all Elliott-related companies resulting in huge losses and loss of investment by shareholders and owners. Over $74 million was paid out in commissions, non-use fees and other related costs out of the total money raised (approximately $170 million between Juan Dolio and Cofresi sales and investments) – an indefensible and monumental percentage of expenditures which could never have been recovered by the investors. |
| Enrique DeMarchena & DeMarchena Kaluche & Asociados | • Was the facilitator for many or most of the Elliotts' transactions relating to Juan Dolio and Cofresi; |
| | • Mr. DeMarchena and his firm have received numerous large payments from the Elliotts for the work they performed, payments which were derived from investor funds; |
| | • DeMarchena's and his firm's involvement in virtually every aspect of the Elliotts' enterprise and business in the Dominican Republic (at least) is pervasive and he and his firm should be held accountable for facilitating many of the potentially illegal activities undertaken by the Elliotts. Mr. DeMarchena and his firm were absolutely instrumental in carrying out the various transfers between corporations, corporate ownership structure and various other transactions with the Elliotts that essentially further improperly and fraudulently alienated the investors from their invested monies, away from their intended purpose and to another ulterior improper purpose and motive; |
| | • Whether Mr. DeMarchena and his firm were the lead architect of these legal maneuvers and/or advice to the Elliotts relating to the same and the Elliotts' misappropriation and/or outright theft of investor money remains to be seen; however, it is likely, and appears to be the case, based upon information received and analyzed, that Mr. DeMarchena and his firm |

| Individual or Entity | Additional Comments (if any) |
|---|---|
|  | took direction from William Lambert and Gardiner Roberts; if not on every major decision and plan, then at least most of them; |
|  | • Many of the transactions were handled through DeMarchena's trust account. As such, he knew or should have known the use of funds was invariably not for the intended purposes of the particular deposits, illegally commingling funds of separate entities. And, he and his firm profited directly from those funds. |
| William Lambert & Gardiner Roberts, LLP | • He (and his law firm Gardiner Roberts) was the legal "puppet master" of the Elliotts' schemes and undertakings. Gardiner Roberts and William Lambert continue to represent Fred Elliott, Derek Elliott and the Elliott-related companies. Yet, Gardiner Roberts by letter dated August 7, 2009 references a guarantee executed by Fred Elliott in February 2009 which was secured by the mortgage on the Erin Township property of Fred Elliott. Gardiner Roberts demanded payment of CDN$800,000 from Fred Elliott by September 10, 2009 or it would "exercise its rights pursuant to the Mortgage"; |
|  | • Additionally, upon information and belief, William Lambert reported James Catledge to the IRS. If this reporting was done through a Form 211, Mr. Lambert could recover a small percentage if the recovery, if any, by the IRS. Any such recovery should be forfeited to the investors, the innocent investors (whether currently a plaintiff or not); Lambert should not be allowed to enjoy and collect upon any reward, especially since he was complicit in most, if not all, of similar activities from the Elliott side; |
|  | • Knew about the missing funds from WWIN (per employees); |
|  | • Was an instrumental part of WWIN and its attendant operations; |
|  | • Knew about the intentions of WWIN to be a money-laundering vehicle for clients; |
|  | • Instrumental in the formation of the various Elliot-related companies which used funds from other corporations. Based upon information received, Lambert was thought of, and acted like, the various Elliott corporations' "super-chairman"; |
|  | • Made millions in fees over the years; |
|  | • Upon information and belief, Mr. Lambert has directed much of the strategy, efforts and decisions in this very lawsuit, and continues to do so to this day, including with the most recent filings by the Elliotts; |
|  | • Was involved throughout the Elliotts' operations, dealings with Catledge, the Idaho securities lawsuit, Greenberg Traurig and numerous other dealings; |
|  | • William Lambert and Gardiner Roberts (along with Concepcion Sexton and Martinez) have an unrecorded "lien" (a Letter of Direction signed by Fred Elliott) on the anticipated proceeds from the sale of Miches. Per the letter of direction, Gardiner Roberts is entitled to up to $500,000; |
|  | • Knew the money used to purchase Miches was taken from Juan Dolio investor funds (may have helped in the process, and helped with the Miches transactions), yet there is no record of any lien by Juan Dolio on the sales proceeds, which should have had precedence over Lambert's purported "right" to such proceeds. In addition, it is highly unlikely that the fees "due" to Lambert and Gardiner Roberts related *primarily* to the Miches project (consequently, allowing Lambert to proceed with his "Letter of Direction" would be a further continuation of the commingling of funds with his full knowledge); |
|  | • Upon information received and analyzed, Lambert received a 5% override on all Bungalow sales; |
|  | • Upon information received and analyzed, Lambert insisted on approving |

| Individual or Entity | Additional Comments (if any) |
|---|---|
| | decisions affecting the Resort even down to the advertising and various travel agent and group travel contracts. |
| Sarah Davies | • Employee/Executive of the Elliott-related companies, at all times material; <br> • Involved in virtually all decisions made and/or attended all management meetings where the decisions were being made; <br> • Admitted to the Manager that she shredded "incriminating" documents following maternity leave (around March of 2009); <br> • Was reluctant to provide information on a timely basis when requested, and it appears her reluctance was an attempt to thwart the undersigned's and the Manager's efficient and timely gathering of documentation and information; <br> • Possessed intimate knowledge of the Elliott, Lambert and Catledge activities, and she was involved with a significant number of the real estate / securities sales when Catledge and Impact were involved with the Elliotts; <br> • She was the one in charge, for the Elliott Defendants, of paying the Non-Use Fees. While she may have received direction from others in the Elliott Group, she directed most, if not all, of these payments. It should be noted that Fred Elliott has taken great pains to explain to the Court that, while he is CEO, he is not aware of the accounting aspects of the business or the day-to-day details, and such responsibilities are put to those in charge of the specific aspects of the business (for example, the corporate controller and transferring of money in violation of the Court's Order). Accordingly, with this framework in mind, Sarah Davies was directly responsible for the payment of the Non-Use Fees (which, in reality, did not exist or should not have existed for at least the Juan Dolio, since the Juan Dolio had zero rooms constructed or rented out for guests – the Juan Dolio was never completed). |
| Gregory Clark | • Former CFO for the certain of the Elliott-related companies; <br> • Facilitated many of the transactions, either independently or at the direction of the Elliotts or Elliott-related companies (including WWIN, CCW and MPS, Ltd.), some of which he controlled and/or "owned" including Continental Corporate Worldwide, Ltd.; <br> • Still holds ownership of the Independence yacht, which was purchased with Juan Dolio investor monies, even though he is no longer employed by the Elliott Defendants. We were contacted by a Dominican attorney purporting to represent Greg Clark and indicating that Clark wanted to turn over the yacht to the Special Master. When pressed, it appeared that Clark wanted payment for costs incurred to store the yacht and/or fix the engine, etc. No further details were provided, and no further communications were received. Greg Clark is still wrongfully holding title to the yacht, when he has no legitimate reason for maintaining his grip, especially so after he has acknowledged, through his purported attorney, that the yacht was purchased with Juan Dolio investor money; <br> • Facilitated the WWIN/CCW operations, including the establishment and use of the SVJD, LLC and EMISV, LLC Nevada corporations along with Jerome Gerber of Impact; involvement with the establishment and use of the Wells Fargo accounts to facilitate the WWIN/CCW operations and the methods/protocols developed by the Elliotts and Catledge for movement of investor monies; <br> • Trustee of Cellwave Networks, Ltd.; <br> • Clark is actually the trustee of many of the corporations owned by the Elliotts, including EMI Resorts (S.V.G.), Inc.; <br> • Holds a vast, detailed knowledge base of the Elliotts' activities, and, for |

| Individual or Entity | Additional Comments (if any) |
|---|---|
| | that matter, the activities of Catledge and Catledge-related entities (though, so far, he has chosen to leave out Catledge's misdeeds in his various affidavits filed with the District Court). |
| John Jason ("Jay") Burley | • Executive VP at one time for the Elliott companies, and the Resort;<br>• Was in charge of construction for the Elliotts;<br>• Sun Village Construction was Burley's "baby" and that company received at least $11,500,000 and possibly up to $21,000,000, which amounts are presently unaccounted for since the accounting records no longer exist (and were no longer in existence when the Manager requested to see them during his tenure);<br>• Many millions (as mentioned) transferred to the construction companies without much support other than payment requisitions;<br>• $12 million supposedly spent on Juan Dolio construction (per the accountants Nina Gomez & Associates' report), but the property did not reflect anything like that having been spent (on hard cost construction);<br>• Concerns of massive kick-backs through overbilling raised by certain Elliott employees;<br>• Much of the Juan Dolio furniture, which was ordered and delivered, disappeared; it is unknown if that was sold to someone else or used at Cofresi;<br>• Burley insisted on transferring monies through Elliott-related companies without regard to source and ownership of funds;<br>• Intentional (for his own pecuniary gain) mismanagement of the Cofresi Resort and other entities he ended upon controlling and/or he assisted with the misappropriation of investor monies relating to the same;<br>• Received excessive salary and benefits. |
| Conrad Griffiths and law firm of Misick & Stanbrook | • Elliotts' Turks and Caicos counsel;<br>• Attorneys for EMI Sun Village, Inc.;<br>• According to the Prospectus, all subscribers' funds were to be held in trust or escrow by the Misick & Stanbrook firm in the TCI. |
| Drew Elliott | • Son of Fred and purported owner of TriPalms Real Estate; paid percentage of sales commissions |
| Marija Stevanovic | • WWIN involvement along with Greg Clark, on behalf of, and at the direction of, the Elliotts |
| Tippy Tan Lawter | • See also, list of Catledge-related parties |
| Michael Lawter | • See also, list of Catledge-related parties |
| Net Wealth Navigators, LLC, a/k/a N.W.N. Group, LLC | • Nevada LLC formed by or for the Lawters' use during their association with the Elliotts at the Cofresi Resort and sales relating to the same (much like the work they performed when they were with Impact and Impact was selling for the Elliotts) |
| Chery Arturo Jimenez | • Principal in Inversiones Aviati, S.A.;<br>• Juan Dolio Promissory note foreclosure "ruse" in conjunction with the Elliotts for the purpose of trying to raise additional funds.<br>• Involvement as "consultant" for the Elliotts and Cofresi;<br>• Assisted with or directed the transferring of funds, on behalf of the Elliotts, in contempt of the District Court's order(s) |

| Individual or Entity | Additional Comments (if any) |
|---|---|
| Carl Carlson | • President of Elliott Miches Holdings, Inc. |
| William J. Trotter and William J. Trotter & Associates | • Fred Elliott's accountant in Canada;<br>• Apparently, Fred Elliott paid, and continues to owe, Mr. Trotter a significant amount of money. Mr. Trotter was/is Mr. Elliott's accountant. He may be directly or partly responsible for the hiding of additional assets, or reclassification of the same. He may also be responsible for preparing Fred Elliott's Canadian tax returns;<br>• Mr. Trotter would be a significant source of information and a likely criminal target for potentially facilitating, if not crafting, certain of Fred Elliott's and/or Derek Elliott's (or any of their related companies) improper and/or criminal movement of money |
| Tim Tuccelli and Aviance | • Former Vice President of the Elliott companies and he received a percentage of sales commissions; his company, Aviance, received significant commissions from the sales of fractional units amounting to $2,834,175 – about 50/50 split between Juan Dolio and Cofresi sales |
| EMI Resorts, Inc. | • Turks and Caicos company;<br>• Managed Cofresi development;<br>• Management company for EMI Sun Village, Inc. (the Cofresi Resort);<br>• Owned by Derek Elliott |
| EMI Resorts Management, S.A. | • Dominican Republic company;<br>• Purpose was to collect revenue generated by hotel operations on behalf of EMI Sun Village, Inc. |
| EMI Sun Village, Inc. | • Turks and Caicos formed;<br>• Had between 1,600 and 1,700 shareholders, including the Elliotts, either directly or through one of their related companies;<br>• Elliotts' management of the company and Cofresi Resort implicates the operations of EMI Sun Village, Inc. both through its general operations and the very receipt and use of significant amounts of Juan Dolio investor monies (approximately $10 to 12 million). |
| Bertus Management, Inc. | • Turks and Caicos company;<br>• Purpose was to buy, at deep discounted prices, shares of EMI Sun Village, Inc. for benefit of Elliotts;<br>• Owned by EMI Resorts (S.V.G.), Inc.;<br>• Managed by Sarah Davies;<br>• Formed by William Lambert. |
| EMI Resorts (S.V.G.), Inc. | • St. Vincent and the Grenadines company;<br>• Managed Juan Dolio and Miches development;<br>• 50% owner in Elliott Miches Holdings, Inc.;<br>• Owned by Derek Elliott (through a trust where Clark is the trustee) |
| Cofresi Developments, Inc. a.k.a EMI Cofresi Development | • Has 178 shareholders;<br>• Owns 50% of Cofresco Holdings |
| Cofresco Holdings, Inc. | • Turks and Caicos company;<br>• Manages assets of Immobilaria Moncey; |

| Individual or Entity | Additional Comments (if any) |
|---|---|
| | • Indirect owner, through the holding company Inmobiliaria Moncey, of the Treasure Bluff property;<br>• Owned 50% by EMI Cofresi Development and 50% owned by Carmor Investments, Inc. |
| Inmobiliaria Moncey, S.A. | • Dominican Republic company<br>• Owns the actual land of Treasure Bluff |
| Kahebram, S.A. | • Dominican Republic company |
| Inversiones Yubaso, S.A. | • Dominican Republic company |
| Inmobiliaria Lirios Del Tropico, S.A. | • Dominican Republic company |
| HSV Holdings, S.A. | • Dominican Republic company |
| Desarrollos Mirador Cofresi, S.A. | • Dominican Republic company |
| Tenedora HSV (BP), S.A. | • Dominican Republic company |
| Villa Santo Ponca, S.A. | • Dominican Republic company |
| Inmobilaria Canadaigua, S.A. | • Dominican Republic company |
| HSV Hoteles De Operadora, S.A. f/k/a EMI Management, Inc. (a/k/a EMI Resorts Management, S.A.) | |
| Promotora Sauco, S.A | • Dominican Republic company;<br>• Owner, or former owner, of the Bungalows (apparently, the Bungalows were sold separately from the rest of the Resort).  The land for the Bungalows was included in HSV Holdings, S.A. |
| Mellesino C. Por A. | • Dominican Republic company;<br>• Owner (or former owner of the Cofresi Cove Condos through EMI Resorts (S.V.G.), Inc.). |
| Tenedora Tunya, S.A. | • Dominican Republic company |
| Inmobiliara Sauco, S.A. | • Dominican Republic company |
| EMI Beach Palms, Inc. | |
| Amber Coast Resort Corporation | |
| Elliott Miches Holdings, Inc. | • Turks and Caicos company;<br>• Development of Miches project;<br>• 50% owned by EMI Resorts (S.V.G.), Inc.; other 50% owned by Alex Shnaider/Sellana; |
| Tenedora Wessex Dominicana, S.A. | • Dominican Republic company |
| Inversiones Chiesto | |
| Inversiones Aviati, S.A. | • Dominican Republic formed;<br>• Chery Jimenez |

| Individual or Entity | Additional Comments (if any) |
|---|---|
| Inversiones Werden, S.A. | • Dominican Republic formed;<br>• Incorporated by Enrique DeMarchena;<br>• Two current shareholders of Werden are also a shareholder and an associate of DeMarchena Kaluche & Asociados;<br>• Upon information and belief, Enrique DeMarchena is the corporation's Secretary;<br>• Questionable transfer/receipt of mortgages and/or ownership of properties held by the Elliotts paid for through the use of investor monies;<br>• Part and parcel to fraudulent transfers of monies and/or assets for the purpose of hindering creditors, among other things. |
| Cellwave Networks, Ltd. | • Gibraltar company;<br>• Owns Sun Village Juan Dolio, Inc. which owns Promotora Xara, S.A. which owned the Juan Dolio property;<br>• Greg Clark is Trustee for Cellwave;<br>• Ownership is structured, per August 5, 2005 Shareholders Agreement, as follows: (a) DRCI Trust at 40.5%; (b) EMI Resorts (S.V.G.), Inc. at 53.5%; (c) Earl Gales at 5%; and, (d) Ralph Lean at 1%. |
| Sun Village Juan Dolio, Inc. | • Turks and Caicos company;<br>• Owns Promotora Xara, S.A. (which owns/owned the Juan Dolio property) |
| Promotora Xara, S.A.; | • Dominican Republic company;<br>• Owns/Owned the Juan Dolio property; was listed on mortgages with Banco del Progreso and Banreservas |
| Continental Corporate Worldwide, Ltd. | • British Virgin Islands company;<br>• Owns the Independence yacht, purchased with Juan Dolio investor monies;<br>• Greg Clark is trustee of this company; he holds title to the yacht in such capacity. |
| Sun Village Juan Dolio Associates, LLC | • Delaware corporation |
| Sun Village JD Holding, Inc. | • Delaware corporation |
| DCS Dominican Construction Services, S.A.; | • Dominican Republic company;<br>• Was the company to undertake the construction at Juan Dolio and Cofresi. |
| Sun Village Construction a/k/a Sun Village Construcciones, S.A. | • Dominican Republic company;<br>• Was headed by Jay Burley and received between $11,500,000 and $21,000,000 which is not presently accounted for. |
| WWIN International, Ltd. | • St. Vincent and the Grenadines company;<br>• See discussion regarding WWIN above. |
| CCW Dominicana, S.A. | • Dominican Republic company;<br>• Check and deposit clearing company for WWIN. |
| MPS, Ltd. | • Dominican Republic company<br>• Same function as, and predecessor to, CCW |
| The Elliott Foundation | • Purportedly a charitable organization, but checks were made out to CCW (the check clearing company for WWIN, which was a money-laundering scheme). A full accounting of the Elliott Foundation is needed. |

| Individual or Entity | Additional Comments (if any) |
|---|---|
| | |
| Elliott Toscana Holdings, Inc., a/k/a Elliott Toscana | • Turks and Caicos company |
| Elliott Regent Holdings, Inc. | • Turks and Caicos company;<br>• Used by the Elliotts to own offices in the Turks and Caicos;<br>• Company owned by EMI Resorts (S.V.G.), Inc. |
| Landmark Lending Corporation | • Turks and Caicos company |
| 408 Cumberland Holdings, Inc. | • Canadian company |
| Hillsburgh Stables, Inc. | • Canadian company<br>• See commentary above regarding Erin Township Property, Fred Elliott and William Lambert/Gardiner Roberts' "mortgage" or lien for CDN$800,000 |
| Orangeville Reservation Services System Centre, Inc. | • British Virgin Islands company;<br>• Made reservations for Cofresi Resort and Spa |
| Orangeville Reservations Services, Ltd | • California company |
| EMI Financial Corporation a/k/a EMI Financial Co. | • Turks and Caicos company, or Canadian company |
| The Elliott Group Ltd. | • Canadian company |
| 1434601 Ontario, Inc. | • Canadian company |
| 1447783 Ontario, Inc. | • Canadian company |
| EMI Management, Inc. | • Canadian company |
| 1211766 Alberta, Ltd. | • Canadian company |
| Tripalms Real Estate, Inc. | • Canadian company<br>• "Owned" by Drew Elliott;<br>• Received percentage of sales commissions. |
| Ocean Palms Real Estate (S.V.G.), Inc | • Elliott document shows this to be a Canadian company, though it is possibly incorporated in St. Vincent and the Grenadines |
| Elliott Real Estate | • Turks and Caicos company;<br>• Purpose was for resale of Juan Dolio units |
| International Corporate Services Ltd. | • Turks and Caicos company |
| International Financial Resorts JD Ltd | |
| Elliott Equities | |
| EMI Development Company | |
| Jeshua Holdings LLC | • Idaho company;<br>• Owned by Mike Fitzpatrick, Derek Elliott and Joseph Puleo;<br>• Relates to purchase of land in Clark Fork, Idaho. |

| Individual or Entity | Additional Comments (if any) |
|---|---|
| Sun Village Cofresi-Sauco, Inc. | |
| Sun Village CS Holdings, Inc. | • Delaware company |
| Passport Condo Owners Association Cofresi I, Inc. | • Delaware company |
| BBQ Investments | • Turks and Caicos company |
| SVJD Resort, Inc. | • Turks and Caicos company |
| Teddy's Island BBQ, Inc. | • Turks and Caicos company |
| SV Resort SPA JD Trust | • Turks and Caicos company |

### 2.    Other Entities Related to the Elliotts:[39]

| Entity | Comments |
|---|---|
| Caribbean Management Services ("CMS") | • Misick & Stanbrook, Richmond House, P.O. Box 127, Providenciales, Turks and Caicos Islands |
| Argon Limited ("Argon") | • 97 Granby Street, P.O. Box 1817, Kingstown, St. Vincent and the Grenadines |
| Berkshire Trust Company Ltd ("Berkshire") | • Caribbean Place, Leeward Highway, P.O. Box 657, Providenciales, Turks and Caicos, British West Indies |
| Nevada Corporate Planners Inc. ("NCP") | • 7469 W. Lake Mead Blvd., Suite 200, Las Vegas, Nevada 89128 and P.O. Box, 28909, Las Vegas, Nevada 89126 |
| National Corporate Research Ltd ("National") | • 615 South DuPont Highway, Dover, Delaware 19901 (Greenberg Traurig)[40] |

### 3.    Companies incorporated by WWIN International on behalf of WWIN clients:[41]

| Entity | Comments (if any) |
|---|---|
| Absolut 1 Corp. | Alexander Stevanovic |
| Camelcorp (Mr. L.) | |
| Cougar Ltd. | |
| Sunwave, Inc. | |
| Bijoux 7475 | |
| Avalon Enterprises | |
| White Owl Corp. | |
| Economic Solutions | |

---

[39] Those companies who helped to service the Elliotts' offshore companies and efforts (beyond those already mentioned).
[40] In an Elliott document the notation "Greenberg Traurig" followed the description of National Corporate Research Ltd.
[41] The Elliotts claim these companies are not Elliott companies and the registered officer is Greg Clark. All are Turks and Caicos formed companies.

| J.W. Creations Ltd. | |
| PK & a Societe Anonyme | |
| Developp Linda Ltd. | |
| Impact Net Worth (SVG), Inc. | Notation was made to say "Catledge" and still noted to be a Turks and Caicos corporation despite the inclusion of "SVG." |
| Millenium International Resources Ltd. | |

## B.    Catledge – related parties to refer to the Appropriate Authorities

| Individual or Entity | Additional Comments (if any) |
| --- | --- |
| | |
| James Catledge | <ul><li>Main architect of the Ponzi scheme to pay out "non-use fees" as a return on the investment of owners, when there was no income and the fees were paid out of subsequent investment from other investors;</li><li>Was extremely vocal and forceful about how to sell the products and specifically to ensure that the Elliotts stuck to the business of running a hotel, while Catledge dealt with the sales;</li><li>Controlled all marketing and related materials, or at least had (or insisted upon) the final say in all such materials;</li><li>Preyed upon unqualified investors and sold "securities" without a proper license (his agents were not licensed either);</li><li>Through the use of his DRCI Trust and WWIN, including the mechanisms behind the Wells Fargo Accounts (and the corporations set up for the same), it is very likely that Catledge's monies (whether from commissions or otherwise) were not properly reported to the United States Internal Revenue Service and are likely located offshore;</li><li>Received huge commissions for the sales made and conversions with no cash benefit to the companies;</li><li>Catledge has also engaged in the transferring of assets out of his name for the potential purpose of hindering creditors (or those who become judgment creditors).</li></ul> |
| Impact, Inc. (Nevada) d/b/a Impactnetwork.com d/b/a ImpactAmerica d/b/a ImpactAmerica.com d/b/a Impact Lending d/b/a Impact Corporate | <ul><li>Nevada company</li></ul> |
| Impact Net Worth, LLC | <ul><li>Nevada company</li></ul> |
| DRCI Trust[42] | <ul><li>Cook Islands Trust;</li><li>Trustee is Jerome Gerber;</li><li>James Catledge and his children are the beneficiaries;</li><li>Received significant percentage of the commissions paid to Catledge;</li><li>Owns 40.5% of Cellwave Networks, Ltd.</li></ul> |
| Impact Air | <ul><li>Funded by Elliott-related companies to "finance" the plane for James Catledge and to fly down clients to sign documents in the Dominican</li></ul> |

---

[42] DRCI Trust is Catledge's Trust. Both the Cellwave Networks Shareholders Agreement and the DCRI Trust formed by Catledge were executed the same day (August 5, 2005). Catledge's counsel has denied that there is actually any true ownership interest in Cellwave by DRCI Trust as certain aspects of the agreement were not consummated. Fred Elliott, at various times in sworn testimony, has vacillated on the issue of whether Catledge and/or the DRCI Trust possessed an ownership interest in Cellwave, and thus Juan Dolio.

Case 1:09-cv-20526-ASG   Document 232   Entered on FLSD Docket 11/12/2009   Page 41 of 50
*Report and Recommendations to District Court on Plaintiffs' Claims*
*Page 41 of 50*

| Individual or Entity | Additional Comments (if any) |
|---|---|
| | Republic and/or to tour the Juan Dolio and Cofresi properties |
| John Thomson | • Impact board member |
| Jerome Gerber | • Impact executive (counterpart to Elliotts' Greg Clark) |
| Levi Rogers | • Impact corporate executive and honorary board member |
| Brent Goodrich | |
| Steve Cabezud | • Impact board member |
| Janet Cabezud | • Impact board member |
| Janie Catledge | • James Catledge's mother (who is also the legal head of several of Catledge's companies);<br>• Assist with, responsible for movement of, Catledge's assets |
| Thomas O'Hagan | • Impact corporate executive and board member |
| Sheila O'Hagan | • Impact corporate executive and board member |
| Barbara Nagel | • Impact board member |
| Margaret Currie | • Impact board member |
| Francisco Reyes | • Impact board member |
| David Brimley | • Impact corporate executive |
| Roger Walser | |
| Tiffany Catledge | |
| Charles Catledge | |
| Impact Real Estate, LLC | |
| Advance Estate Planning | |
| Potenza Nevada Trust | |
| Potenza Management, LLC | |
| Impact Residential, LLC | |
| North Shore, LLC | |
| Target Trust | |
| Potenza Holdings, LLC | |
| Executive Retirement Planning, Inc. | |
| Impact Holdings, LLC | |
| Impact Holdings, Inc. | |
| Impact Commercial, LLC | |
| Net Worth Solutions | |

## C. Parties Related to both Elliott and Catledge – to be Referred to the Appropriate Authorities

| Individual or Entity | Additional Comments (if any) |
|---|---|
| | |
| EMISV, LLC | • Nevada company;<br>• Formed May 26, 2006 by Greg Clark (on behalf of Elliotts) and Jerome Gerber (on behalf of Catledge/Impact);<br>• Address used is Impact's corporate headquarters;<br>• Possessed Wells Fargo bank account in Henderson, Nevada;<br>• See discussion above. |
| SVJD, LLC | • Nevada company;<br>• Formed May 26, 2006 by Greg Clark and Jerome Gerber;<br>• Address used is Impact's corporate headquarters;<br>• Possessed Wells Fargo Bank account in Henderson, Nevada |

| Individual or Entity | Additional Comments (if any) |
|---|---|
|  | • See discussion above. |
|  |  |
| CCW Ltd. | • Fictitious name – Nevada filed on May 26, 2006;<br>• Owned by SVJD, LLC;<br>• Address used is Impact's corporate headquarters and Jerome Gerber is listed in filing;<br>• Used interchangeably with EMISV, LLC and SVJD, LLC and Sun Village Juan Dolio on checks written by investors and deposited into the various Wells Fargo bank accounts by Impact and/or Elliotts (through Marija Stevanovic or Greg Clark)<br>• See discussion above. |
| Cellwave Networks, Ltd. | • As noted above, but since both the Elliotts and Catledge owned interests in this company (Elliotts through EMI Resorts (SVG), Inc. and Catledge through the DRCI Trust), it is included as related to both parties |

**D.     Parties not *Directly* Related to Either Catledge or Elliotts – to be Referred to the Appropriate Authorities for Further *Investigation***

| Individual or Entity | Additional Comments (if any) |
|---|---|
| **Ralph Lean** and the law firm of **Cassels Brock** | • Ralph Lean is a 1% shareholder in Cellwave Networks Ltd. (the other owners are EMI Resorts (S.V.G.), Inc. at 53.5%, DCRI Trust at 40.5% and Earl Gales at 5%). Cellwave is the company which owns 100% of the shares of Sun Village Juan Dolio, Inc. Sun Village Juan Dolio, Inc. wholly owns Promotora Xara. Promotora Xara is the company that "owns" the actual Juan Dolio property – or did until the foreclosure of September 10, 2009. Thus, for all intents and purposes, and cutting through the sham corporate shell forms, Cellwave (and its shareholders) owned the Juan Dolio property;<br>• Whether or not Mr. Lean actually received compensation from investor monies up to or approaching his 1% interest remains to be analyzed and confirmed. If Mr. Lean did receive such funds, they were nothing more than ill-gotten gains from the Ponzi scheme concocted by James Catledge, and to a lesser extent the Elliotts. These gains likely were also received by the law firm of Cassels Brock through Mr. Lean.<br>• Again, Mr. Lean is a 1% owner of the Juan Dolio property through Cellwave. The Juan Dolio investors had their money misappropriated by the Elliotts and invested in Miches, to the approximate tune of at least $7.5 |

---

[43] The undersigned is aware that Colin Ground, Esq. is a partner in the Toronto, Canada office of the Cassels Brock law firm with Ralph Lean, Esq. However, it is specifically noted that the undersigned has not received or analyzed any materials *at this point* which would implicate Mr. Ground in any potential criminal wrongdoing or other impropriety. Yet, the close relationship between Ralph Lean and Mr. Ground (i.e., partners in the same office) does raise some concerns. The undersigned is likewise aware that Mr. Ground and the Cassels Brock law firm represent Trans-stahl, Sellana, Midland and Alex Shnaider (at least with respect to the Miches property and related issues). While prior Reports have been critical of the Trans-stahl loan to Derek Elliott (and to some extent even Mr. Ground's *interpretation* of that agreement) such criticism was intended toward the Elliotts' actions (and that of their agents). The criticism was not and is not directed toward the actions of Mr. Shnaider, his companies or Mr. Gound. With that said, it is possible that further evidence may come to light that could change this preliminary conclusion. Further, to the extent any additional evidence suggests that Mr. Shnaider, his companies or Mr. Ground were complicit with the Elliotts and/or the Trans-stahl loan (and related matters) was not an arms-length transaction, additional investigation would then be warranted. To be clear, at this time, the undersigned has not reviewed any materials which would indicate any criminal wrongdoing or other impropriety on the part of Mr. Ground (individually, Mr. Shnaider, or Mr. Shnaider's companies).

| Individual or Entity | Additional Comments (if any) |
|---|---|
| | million. Yet, only the Elliotts stand to possibly gain between $3.5 and $9 million (probably on the lower side) from any sale of the Miches property. That amount will be further reduced by the approximate $1 million personal loan made to Derek Elliott by Alex Shnaider. It was Colin Ground and the law firm of Cassels Brock who filed the initial Wind-Up Petition of EMI Sun Village, Inc., and may do so again since the September 15, 2009 payment to Trans-Stahl was not able to be made, due to the lack of funds;[43] |
| | |
| Earl Gales | • 5% owner of Cellwave, and thus the Juan Dolio property, as discussed above with Ralph Lean. |

## V.     Listing of Documents and Materials Removed, and Chain of Evidence

### A.     Physical documents and other materials which were removed and secured by the Manager and Special Master at the Court's direction[44]

#### 1.     Removed on September 2, 2009

    a.     All available WWIN hardcopy documents; and,
    b.     Billing invoices from William Lambert and Gardiner Roberts

#### 2.     Removed from Cofresi on or about September 17th through 20th:

    a.     Servers, for the following:
        i.     Active Directory;
        ii.     Payroll;
        iii.     User Files;
        iv.     Maximizer;
        v.     QuickBooks;
        vi.     Navision
        vii.     Microsoft Exchange (emails); and,
        viii.     WWIN.
    b.     WWIN computer; and,
    c.     Documents (approximately 350 boxes).

#### 3.     Backup tapes for the servers (15 tapes)

The backup tapes for the servers were received via Federal Express by Kip Rabin, as sent by Eiro Jimenez (the Elliotts' former head IT employee), on or about October 8, 2009.

---

[44] *See*, Section I.B, *supra*.

Case 1:09-cv-20526-ASG   Document 682   Entered on FLSD Docket 11/12/2009   Page 44 of 50
*Report and Recommendation to Court regarding Preliminary Analysis*
*Page 44 of 50*

**B.**   **Chain of evidence for the items removed and secured:**

1.   **WWIN documents and Lambert bills (removed September 2, 2009) –**

   a.   Elliotts to Kip Rabin to Joseu Mercedes of Medina & Rizek;
   b.   Held in temporary storage by Medina & Rizek;
   c.   Shipped out via air freight carrier (AMX Cargo) to Miami;
   d.   Upon arrival to Miami, the materials were delivered to Kip Rabin at the MIA airport;
   e.   Whereupon, the documents were transported for Kip Rabin by A-1 Fargo Van & Storage, Inc. to the current secured location as controlled by Kip Rabin.

2.   **Materials removed between September 17th and 20th –**

   a.   Documents, servers and certain computers removed from Cofresi Resort;
   b.   Materials were loaded into truck by personnel directed by Joaquin Duenas at the instruction of the Manager;
   c.   Truck was driven to Santo Domingo and materials remained in custody of those individuals whereupon they were transferred to Jose Rizek and the freight shipper in the Dominican Republic (AMX Cargo) to be shipped along with the WWIN documents and Lambert bills;
   d.   The freight shipper reboxed and palletized the documents in preparation for air freight transport to Miami International Airport;
   e.   Materials flown to Miami International Airport;
   f.   Materials delivered to and signed for by Kip Rabin at Miami International Airport;
   g.   A-1 Fargo Van and Storage transported materials for Kip Rabin from the Miami International Airport to the secure location where the materials are in the control of Kip Rabin.

3.   **Backup tapes for Server -**

   a.   Eiro Jimenez (Elliott IT head) sent the tapes directly to Kip Rabin in Miami, Florida via Federal Express;
   b.   Tapes were retrieved by Mr. Jimenez from where they were stored in a safe deposit box; and,
   c.   Tapes received by Kip Rabin on or about October 8, 2009, and tapes are currently stored at the same secure location all the other materials described above.

**VI.**   **Document Categories for Production by James Catledge and Associated Entities and Individuals**

As part of the undersigned's forensic analysis and recommendations to the Court, it is further recommended that James Catledge and/or his associated entities over which he has control,[45] produce the following items to the Court:

1.   All bank statements for the Wells Fargo accounts, bearing account numbers 2782170696, 2782170704 and 2782171025;

2.   All bank statements for any other accounts, certificates of deposit and the like at Wells Fargo bank, held either in James Catledge's name or in that of any company over which James Catledge has control (or had control during the time period from March, 2004 to the present date);

3.   All cancelled checks, deposits slips, wire transfer confirmations and receipts, for said Wells Fargo accounts;

4.   All opening account documentation for the Wells Fargo accounts;

5.   All documents which relate to the formation and operation of the DRCI Trust;

6.   All financial records relating to the DRCI Trust, which detail or show all incoming and outgoing funds since August 5, 2005 to the present date;

7.   All financial documentation, including but not limited to general ledgers, bank account statements, brokerage statements and records provided to or held by any accounting firm, for the Impact-related entities;[46]

8.   James Catledge's personal financial information, including any and all personal financial statements, prepared for any purpose, over the past 6 years, and all tax returns filed for the past 6 years in the United States and any other jurisdiction;

9.   All tax returns filed, with any jurisdiction, for James Catledge's children and wife (to the extent they are separate from James Catledge's own return) for the past six years;

10.   A detailed listing and identification of any and all bank accounts, brokerage accounts, trust accounts used by James Catledge at any time during the past 6 years;

11.   A detailed listing and identification of any and all bank accounts, brokerage accounts, trust accounts from which James Catledge, either directly or indirectly, has received money during the past 6 years to the present date, and which relate in any way to sales of real estate product at Juan Dolio or Cofresi, or any other Elliott-related property;

12.   A detailed listing and identification of any and all bank accounts, brokerage accounts, trust accounts and the like through or from which James Catledge, either directly or indirectly has received money during the past two years to the present date, and/or through which he continues to receive money;

---

[45] If Mr. Catledge states that he does not have the documents sought, or that he has no possession, custody or control of those documents, Mr. Catledge should provide specific descriptions of the following: (1) where the documents are located, if known; and, (2) who has possession, custody or control of the documents and materials sought.

[46] "Impact-related entities" means those entities identified in Section IV.B and IV.C. of this Report.

13. Any and all documentation relating to the formation of the ECC committee and a detailed accounting of all funds provided to the ECC committee for use in filing and prosecuting the instant case;

14. A detailed listing of any and all pending actions against James Catledge and/or Impact-related entities in any jurisdiction;

15. A detailed listing and description of any and all unsatisfied monetary judgments from any jurisdiction entered against James Catledge and/or Impact-related entities;

16. Copies of any and all judgments entered in any jurisdiction against James Catledge and/or any Impact-related (i.e., James Catledge owned or controlled) entities;

17. Any and all videos, recordings or transcriptions of any seminars, webinars, speeches or other similar discussions in which James Catledge discusses or discussed any Elliott-related real estate product or business venture involving the Elliotts (or any of the Elliotts' companies or interests);

18. A detailed listing of any and all assets in James Catledge's personal name, or any such assets in which he holds a beneficial interest (through a Trust, corporation or otherwise);

19. Any and all marketing materials utilized by James Catledge and Impact, and Impact related entities and agents, to sell the real estate products at Juan Dolio and Cofresi;

20. All documents relating to the DRCI Trust ownership interest in Cellwave;

21. A detailed listing of all bank accounts, savings accounts, brokerage accounts, trusts, or other holdings which you or any of the Impact and Impact related companies own, control or in which you or they hold a beneficial interest;

22. General ledgers for all James Catledge related/owned companies, including any interim or year-end financial statements (for the period when the investor monies were first collected to the time of filing the instant lawsuit);

23. All financial documents for each of the companies and corporations listed above in Section IV.B. and IV.C. above (i.e., the Catledge-related entities);

24. Any and all emails exchanged between: (a) James Catledge, and (b) Derek Elliott, Fred Elliott, William Lambert (or anyone else at Gardiner Roberts, LLP), Rick Davis (or anyone else at Greenberg Traurig, LLP), Sarah Davies, Gregory Clark, Jason Burley, Enrique DeMarchena, Ralph Lean, or Colin Ground (or anyone at Cassels Brock & Blackwell, LLP);

25. Any and all emails exchanged between any Impact-related individual (i.e., the agents) and any Elliott-related employee (i.e., any employee of any Elliott-related company);

26. Similar requests to the above should be made to all the individual Catledge and Impact-related individuals who are (or were until October 17, 2009) plaintiffs in this matter (including, but not limited to: David Brimley, Steve Cabezud, Janet Cabezud, Margaret Currie, Tom O'Hagan, Sheila O'Hagan, Barbara Nagel and John Thompson).


## VII.   Conclusion

Based upon the undersigned's and Manager's preliminary forensic analysis of the records and information available, some of which is generally discussed in this Report, and following an extensive and difficult consideration, the undersigned respectfully recommends that the District Court do as follows:

1.  Refer the individuals and entities listed in Section IV of this Report to the appropriate authorities:[47]

    a. **The United States Department of Justice in Washington, D.C.**

    b. **The United States Attorney for the Southern District of Florida:**

    > United States Attorney's Office
    > Attn:  Jeffrey H. Sloman, Acting U.S. Attorney
    > 99 N.E. 4th Street
    > Miami, Florida  33132

    c. **The Federal Bureau of Investigation (Miami Office):**

    > Federal Bureau of Investigation
    > 16320 NW 2nd Avenue
    > North Miami Beach, Florida  33169

    d. **The Florida Attorney General:**

    > Office of Attorney General Bill McCollum
    > State of Florida
    > PL-01, The Capitol
    > Tallahassee, Florida  32399-1050

    e. **The United States Internal Revenue Service:**

    f. **The United States Securities and Exchange Commission:**

    > SEC Complaint Center
    > 100 F Street NE
    > Washington, D.C.  20549-0213

---

[47] Unfortunately, based upon the current circumstances, the criminal or appropriate authorities may be the innocent investors' (both those who are parties to this action and those who are not) only hope to receive some manner of justice against those who caused them harm and who have financially benefited from the investors' plight, and those who continue to benefit.

g.  Potentially, **other states' Attorney Generals** as necessary or appropriate for further evaluation and investigation and potential prosecution;[48]

h.  **The appropriate authorities in Canada, including:**

> The Canadian Royal Mounted Police;
>
> Ontario Securities Commission
> 20 Queen Street West, Suite 1903
> Toronto, ON
> M5H 3S8
>
> Ministry of the Attorney General
> McMurtry-Scott Building
> 720 Bay Street, 11th Floor
> Toronto, ON
> M5G 2K1
>
> Canada Revenue Agency
> Ontario Region Informant Leads Centre[49]
> St. Catharines Tax Services Office
> 32 Church Street
> P.O. Box 3028
> St. Catharines, ON
> L2R 3B9

i.  **The appropriate licensing authorities, or bar associations, relating to the attorneys in Canada**, including:

> The Law Society of Upper Canada
> Osgoode Hall, 130 Queen Street West
> Toronto, Ontario  M5H 2N6

j.  **The appropriate authorities in the Dominican Republic:**

> Ministerio Publico
> Procuraduria General de la Republica
> Ave. Jimenez Moya esq. Juan Ventura Simon
> Centro de los Heroes
> Constanza, Maimon y Estero Hondo

---

[48] One example would be Attorney General Lawrence Wasden and Deputy Attorney General Alan Conilogue of the State of Idaho, who already have a pending matter against the Elliotts, Catledge and others.  The contact information for Mr. Wasden and Mr. Conilogue is Office of Attorney General; 700 W. State Street; P.O. Box 83720; Boise, ID 83720-0010.

[49] If other provinces are necessary, beyond Ontario, the proper addresses are easily obtained.

Unidad del Ministerio Pubico Avtilavado de Activos
Procuranduria General de la Republica
Calle Hipólito Herrera Billini, esq. Juan de Dios Ventura Simón,
Palacio de Justicia del centro de los heroes
Constanza, Maimon y Estero Hondo

**k.   The appropriate licensing authorities, or bar associations, relating to the attorneys in the Dominican Republic;**

Dominican Bar Association
Colegio de Abogados de la Republica Dominicana
Casa de Abogado
Calle Isabel la Catolica No. 151
Santo Domingo, Dominican Republic

**l.   The appropriate criminal and other authorities in the Turks and Caicos Islands:**

Attorney General Honorable Kurt de Freite
Attorney General's Chambers
South Base, Grand Turk
Turks & Caicos Islands
British West Indies

Financial Services Commission
Caribbean Place Plaza
Leeward Highway
Providenciales
Turks & Caicos Islands
British West Indies

**m.   The appropriate licensing authorities, or bar associations, relating to the attorneys in the Turks and Caicos Islands[50]:**

Turks & Caicos Islands Bar Association
P.O. Box 97
Wiggles3woth Building
Leeward Highway

---

[50] With regard to Conrad Griffiths, he is also purportedly licensed by the State Bar of California. As such, he should likewise be referred to the State Bar of California:
    Office of the Chief Trial Counsel/Intake
    The State Bar of California
    1149 South Hill Street
    Los Angeles, California 90015-2299

Providenciales
Turks & Caicos Islands
British West Indies

2.    Order James Catledge and his Impact-related entities and individuals (see Sections IV.B. and IV.C. *supra*) to produce the documentation and information set forth in Section VI (numbers 1 through 26), *supra*, within twenty (20) days from the date of the Order;

3.    Enter an order re-freezing each of Enrique DeMarchena's and DeMarchena Kaluche & Asociados's U.S. Accounts (see accounts set forth in Court's *Order Freezing Account ("Freeze Order")*, D.E. 569); and,

4.    Enter an order re-freezing all of the Elliott-related ResortCom accounts (see accounts set forth in Court's *Order Freezing Account ("Freeze Order")*, D.E. 575.

RESPECTFULLY SUBMITTED in Miami, Florida this 10th day of November, 2009.

SPECIAL MASTER THOMAS E. SCOTT

Copies furnished to:
U.S. District Judge Alan S. Gold
Counsel of record