UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
*Lead case:* NO. 09-20526-CIV-GOLD/MCALILEY
*Related case*: NO. 09-20657-CIV-GOLD/MCALILEY
*This document relates to both actions[1]*

KLAUS HOFMANN, *et al.*

     Plaintiffs,

v.                                                    **CASE NO. 09-20526-CIV-GOLD/MCALILEY**


EMI RESORTS, INC., et al.,

     Defendants.

_____/

AURELIO AGUILAR, et al,

     Plaintiffs,

v.                                                    **CASE NO. 09-20657-CIV-GOLD/MCALILEY**

EMI RESORTS, INC., et al.,

     Defendants.

_____/


<u>OMNIBUS ORDER FOLLOWING FEBRUARY 1, 2010 HEARING</u>

**I.     Introduction**

    As the docket sheet demonstrates, this case has been extraordinarily contentious

since it was first filed in March 2009.  While most civil actions focus on the merits of the

underlying dispute, this case has been inundated with ancillary issues, including alleged

ethical and criminal violations, petitions by non-parties seeking to intervene, foreclosures,

concomitant foreign proceedings and more, many of which still require resolution.  This

_____

[1]All record citations refer to the lead case's docket unless otherwise indicated.

1

Order addresses as many of the outstanding issues as practicable, given their number and complexity. Oral argument was held on February 1, 2010. The most pressing matter was the Defendants' objections to the Special Master's Report and Recommendation that this Court report certain activities to authorities for criminal investigation.

The Special Master's Report and Recommendation is very serious.[2] For reasons stated in this Order, I have a solemn duty to "preserve the integrity of this Court" and to "notify the proper authorities" in accordance with the Federal Judicial Code of Conduct because I conclude that a crime has been, or may have been, committed in connection with a matter over which I preside.  *See* Code of Conduct for the United States Judges, Compendium Section § 1.1(c) (2009); *cf. Brookings v. Clunk*, 389 F.3d 614, 623 (6th Cir. 2004) ("Additionally . . . Judge Clunk had an obligation to report potentially obstructive conduct to the proper authorities if he felt such conduct had occurred in a case before him.").

The Special Master's Report and Recommendation does not occur in a vacuum of which I have no understanding.  I already have devoted significant time (as evidenced by the already lengthy docket) to hear numerous matters in this case.  I have acquired detailed knowledge as a result of the preliminary injunction hearings, contempt hearings, and other miscellaneous hearings at which I have heard  testimony, reviewed numerous

---

[2] In addition to the Report and Recommendation, I have also considered the Special Master's "Response to Objections filed in Opposition to Report and Recommendation Following Preliminary Analysis." **[DE 909]**. This response emphasizes that the original report was "preliminary," although, in the opinion of the Special Master, the materials and information reviewed support its conclusions and recommendations. I concur with the Special Master that the Defendants, and their attorneys, to the extent they may be investigated and/or eventually prosecuted, will be afforded all required and available due process in those other proceedings.

documents, and had an opportunity to determine the credibility of witnesses. This prior background has helped me place into context the Report of the Special Master which I am now considering and which is the primary subject of this Order.

I have had serious reservations about this litigation from the beginning.  As noted in  my "Interim Order Following Hearing on Preliminary Injunction and Appointing Special Master" **[DE 348]**, it was clear that many hundreds of innocent investors have suffered greatly.  Derek and Frederick Elliott ("the Elliotts"), individually, and acting on behalf of the numerous corporations they control in foreign countries, have claimed the fault lies with James Catledge and his Impact sales associates, who marketed the Dominican resort projects at issue in these proceedings.  Based on what I heard directly  from  Plaintiff Hofmann and other witnesses at the preliminary injunction hearing, I never did understand – and still do not understand – why Catledge, his principal associates, and his company, Impact, were not named as party defendants in the most recent Amended Complaint. Nearly everyone else associated with the Juan Dolio and Cofresi projects was named by the Plaintiffs.  As early as May 22, 2009, I voiced my concerns, finding a "lack of candor and actions of both Plaintiffs and Defendants." **[DE 348, p. 12]**.

In the beginning, I gave the Elliotts the benefit of the doubt that they were misled by Impact and Catledge, and were being set up in an aggressive civil action funded by Catledge as a ploy to divert attention from himself.  This contention was initially supported by the dual manner in which these proceedings were filed: besides the *Hofmann* case, a companion proceeding was initiated by numerous additional plaintiffs,[3] which included

---

[3]  *See* Case No. 09-20657-CIV-GOLD, known as the "*Aguilar*" case.  Notice of voluntary dismissal filed on October 17, 2009.

Catledge and his Impact associates.

After considering the evidence presented at the preliminary injunction hearing, I believed that the Elliotts should be allowed to attempt to save the Cofresi and Juan Dolio projects because they were most familiar with them, and ordered the Elliotts to provide a business plan to do so.  What I received was patently insufficient and raised immediate concerns about what was really going on in this case.  I needed help to sort all of this out, and therefore appointed Special Master Thomas E. Scott, a former United States District Judge and a former United States Attorney for the Southern District of Florida, to assist me.  As things progressed, my confidence in the Elliotts, and in what they had been telling me, diminished greatly, resulting in findings of contempt after motions by the Plaintiffs and upon recommendations from the Special Master.

As detailed in my discussion below, Special Master Scott's role in this matter has increased incrementally by order of this Court.  I increased his responsibilities, with the consent of the parties, as it became clear that the Elliotts were unable to save the projects from foreclosure. I also increased Special Master Scott's role as I lost confidence in the Elliotts and in the truthfulness of their representations.  I only  declined to appoint a receiver because of the complications of having one recognized in the Dominican Republic. Out of necessity, I expanded Mr. Scott's role to that of a "Monitor," because I was greatly concerned about what happened to the millions of dollars in investor money.  I had good reason to believe, and still believe (particularly after hearing from the Defendants and their new counsel at the February 1st hearing), that the Elliotts and their companies seek to regain possession of the projects, either directly or indirectly, after the foreclosures wiped out the investors.  I also remain concerned that investor money was improperly used by

4

the Elliotts to purchase the Miches property, which is now being offered for sale.  The only check in place to prevent the execution of such a scheme is by means of the Monitor Order **[DE 528]** ("the Monitor Order").  If anything is clear after the last hearing, the Defendants desperately want the Monitoring Order and Tom Scott to leave them be so they can once again go about their business without Court scrutiny.

Under my authority, Mr. Scott placed Mr. Kip Rabin, an accomplished forensic accountant and businessperson, on-site to see what was happening to the money and to assist with the monitoring functions.  From what Mr. Rabin saw and reviewed, and from what Mr. Scott reported, I found a great likelihood that important documents were in danger of being destroyed to hide possible crimes, and I authorized Mr. Scott and Mr. Rabin to secure the documents and prepare a preliminary forensic analysis.  By then, the investors' interests had been wiped out through foreclosures.

While I understand Defendants' concerns regarding a referral to the appropriate authorities, I cannot stand idly by as revelations of seemingly criminal activity continue to amass.  In referring this matter to the authorities, I acknowledge and affirm that I am not a prosecutor.  As such, the reference will be made in a neutral fashion,[4] carefully calculated to avoid passing judgment on the culpability of the persons involved.  However, to the extent that my silence can be construed as indifference to the allegations of criminal activity that have effectively engulfed this case, I remain silent no longer.

---

[4] *Comuso v. National R.R. Passenger Corp.*, 2000 WL 502707, *7 (noting that "[w]hen a judge decides to take action in response to perceived misconduct, the reference to appropriate authorities should be made in a neutral fashion.") (quoting Code of Conduct for United States Judges, Compendium § 1.1(d) (1999)); *see also* Section II(E), *infra*.

5

## II.   The Special Master's Report and Recommendation Following Preliminary Forensic Analysis

### A.   The Appointment of the Special Master and the Monitor Expansion

I now turn to address in more detail the matters introduced above.  As the parties are aware, Special Master Scott has been serving as Special Master in this matter since May 22, 2009 per court order.  *See* **[DE 348]**.  His appointment was made pursuant to Federal Rule of Civil Procedure 53, which allows district judges to appoint a master to "address pretrial and post-trial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district."  Special Master Scott's appointment was ordered following a hearing on a motion for preliminary injunction, when it became apparent that I  was in need of assistance to "investigate and recommend resolution of the many issues present[ed] in this case" – issues that required such a tremendous amount of travel, investigation, and coordination with the parties that they would have been impossible for myself or a magistrate judge to address without assistance.  *See* **[DE 348]**.

In my Order appointing Special Master Scott, I specifically noted that "I envision[ed] Master Scott's role to involve two phases – the first an investigation, and the second a recommendation."  *Id.*   With regard to the investigation, I ordered that it encompass, among other things, "the potential diversion of Juan Dolio monies to other Elliott businesses, including whether such diversion was at the behest of James Cateldge."  *Id.* In accordance with my directives, the Special Master began his work in earnest.

By July 2009, it had become apparent – thanks in large part to the excellent investigative work of the Special Master – that the situation at the Juan Dolio and Sun

6

Village Cofresi properties was dire, and that there was a "serious and imminent threat of foreclosure." **[DE 528, p. 1]** ("the Monitor Order"). After considering the possibility of appointing a receiver at an emergency hearing, the Plaintiffs and the Elliott Defendants[5] agreed to "the granting of enhanced monitoring authority to the Special Master." *Id.* at 2. That authority – which was expressly bestowed upon the Special Master by this Court – provided the Special Master with the "full power and authority necessary to carry out" the following, among other things: (1) "[i]nvestigate any and all transfers of monies, property, assets, records or other tangible things that the Monitor may believe have wrongfully, illegally, or otherwise improperly been misappropriated or transferred, including but not limited to monies or other proceeds directly or indirectly traceable from the Elliott Defendants"; (2) "[h]ave access to inspect, review, audit, inventory, assess and evaluate all property, assets, and estates of every kind, whatsoever and wheresoever located,

---

[5] The term "Elliott Defendants" was defined in the pertinent Order, which stated that "the Elliott Defendants shall mean and include: EMI Resorts, Inc., EMI Sun Village, Inc., HSV Hoteles De Operadora, S.A., f/a/a EMI Resorts Management, S.A., EMI Resorts Management (S.V.G.), Inc., Elliott Hospitality and Real Estate Inc., Elliott Group, EMI Cofresi Developments, Inc. a/k/a Cofresi Developments, Inc., Elliott Management, Inc., a/k/a EMI Management, Inc., Sun Village Juan Dolio, Inc., Promotora Xara, S.A., Elliott Miches Holdings, Inc., Inversiones Yubaso, S.A., Inmobiliaria Lirios Del Tropico, S.A., Inmobiliaria Canadaigua, S.A., HSV Holdings, S.A., Desarrollos Mirador Cofresi, S.A., Tenedora HSV [BP], S.A., Tenedora Wessex, S.A., Villa Santa Ponca, S.A., , Elliott Regent Holdings, Inc., Elliott Toscana Holdings, Inc., Landmark Lending Corporation, 408 Cumberland Holdings, Inc., Bertus Management, Inc., Orangeville Reservation Services, Ltd., CCW Dominicana, S.A., MPS Ltd., S.A., Cofresco Holdings, Inc., Immobiliaria Moncey, S.A., Cellwave Networks, Ltd., WWIN International Ltd., Mellesino C. Por A., Tenedora Wessex Dominicana, S.A., Sun Village Contrucciones, S.A., Sun Village JD Holding, Inc., 1211766 Alberta Ltd., Tripalms Real Estate Inc., Ocean Palms Real Estate (SVG) Inc., De Marchena Kaluche & Asociados, Enrique De Marchena, an individual, N.W.N. Group, LLC, a/k/a Net Wealth Navigators, LLC, Michael Lawter, an individual, Tippy Tan Lawter, an individual, Frederick Elliott, an individual, and Derek Elliott, an individual, and their subsidiaries, parent companies, principals, agents and all others acting in active concert with them, as well as any and all entities which the foregoing may own or control (whether directly or indirectly, including through a trustee or nominee)." **[DE 528, p. 2 n. 2]**.

belonging to or in the possession of the Elliott Defendants and all entities that they own or control (directly or indirectly, including through a nominee or trustee)"; and (3) "[a]ppoint one or more special agents, employ legal counsel, actuaries, accountants, clerks, consultants and assistants as the Monitor deems necessary."  *Id.* at 2-4.

B.    *The Special Master's Investigation, the Preservation of Evidence, and the Special Master's November Report Following Preliminary Forensic Analysis*

As the Special Master's investigation progressed, the need to protect sensitive and highly relevant information became a serious concern, particularly given the threat of foreclosure and the lack of security at the Cofresi Resort.  Ultimately, these concerns became so grave that the Special Master advised that the court-ordered investigation was in imminent danger of being irreparably jeopardized.  As such, the Special Master and Mr. Rabin requested, on an emergency basis, "[t]hat [Mr. Rabin] be authorized, as the District Court's direct representative to seize and remove any and all documentation, computers, hard-drives or other similar materials which exist on the Cofresi Resort and which [Mr. Rabin], in his discretion, believes contain sensitive or relevant information to the issues in this lawsuit."  **[DE 829]**.  Recognizing the detrimental and irreversible consequences that would result from the loss or destruction of such documents, I granted the Special Master's request on September 16, 2009.  *See* **[DE 833]**.

On September 18, 2009, the Special Master prepared a Report and Recommendations in anticipation of a hearing on various contested matters.  *See* **[DE 706]**.  This report provided, among other things, an update as to the inspections, assessments, and analyses undertaken by the Special Master in accordance with the Monitor Order.  *See* **[DE 706]**.  Specifically, the September 18th Report noted that "[a]fter

8

a long five (5) weeks of the Manager's direct involvement at the Resort . . . massive amounts of information and documentation (some electronic and some physical) [had] been obtained" and requested the Court's permission to continue a "forensic examination of the records and information obtained to date . . . in preparation for providing an interim report and recommendation regarding the future course of conduct."[6]  *Id.* at 23-26.  At the September 18, 2009 hearing, I expressed to the parties that I intended to allow the Special Master to continue his limited forensic examination of the available materials.  **[Sep. 18, 2010 Tr. at 21:23 - 22:2]**.  No objections were raised, and my decision was subsequently memorialized in a written order.  *See* **[DE 714]**.

In accordance with my directives, the Special Master issued his Report and Recommendation Following Preliminary Forensic Analysis on November 12, 2009 **[DE 832]** ("the Report").  This Report, which is based on a preliminary forensic analysis of materials obtained both directly from the Defendants and from the resorts themselves, outlines what the Special Master suspects was a "massive fraud and, essentially, a theft of investor monies" carried out by James Catledge, the Elliotts, and their respective employees, attorneys, and agents via a "Ponzi-type scheme."  *Id.*  at 8, 13.  The Report notes that, in the Special Master's opinion, "[t]here is enough and sufficient information available which establishes a reasonable and supportable conclusion that criminal activities have occurred and/or are still ongoing" and suggests that these "activities [] be investigated and prosecuted."  *Id.* at 5.  The Report then identifies a number of "individuals and entities

---

[6] This request was made notwithstanding the fact that the Special Master had not been compensated for much of his work and recognized that it was unlikely that there would be funds available to compensate him and his team for their continuing efforts.

[that] should at least be evaluated and investigated by the appropriate authorities" for having possibly participated in, facilitated, or otherwise assisted criminal acts, including "criminal RICO violations . . . securities violations . . . wire fraud, tax fraud, and money-laundering." *Id.* Finally, the Special Master concludes the Report with a series of specific recommendations. First, he recommends that the individuals and entities listed in the Report be referred to the appropriate criminal authorities, which are identified therein. *Id.* at 50. Second, he recommends that James Catledge be ordered to produce certain documents to this Court. *Id.* Third, he recommends that I enter an order re-freezing certain accounts belonging to Defendants Enrique De Marchena and De Marchena Kaluche & Asociados ("the DMK Defendants"). *Id.* Fourth and finally, he recommends that I re-freeze all of the Elliott-related ResortCom accounts. *Id.*

C.   *Objections to the Special Master's November 12, 2009 Report Following Preliminary Forensic Analysis*

Not surprisingly, the Special Master's November 12, 2009 Report drew vociferous objections from the Defendants referenced therein. The first Defendants to object were the DMK Defendants  *See* **[DE 859]**. In their Objections, the DMK Defendants argue that the Special Master "overreached his legal authority and impermissibly usurped the duties and obligations of the Plaintiffs, this Court, and the putative jury" in authoring the Report. *Id.* at 7. Specifically, the DMK Defendants assert that "nowhere in the terms of reference . . . was the special master charged with developing and proving a two-tier RICO liability theory of the case." *Id.* at 8. They further contend that this Court impermissibly "refer[red] the determination of the case's underlying RICO merits to a special master" in a manner that constituted "an abdication of judicial function depriving the parties of a trial before the

10

court on the basic issues involved in the litigation." *Id.* at 8-9.

Then, on December 16, 2009, the Corporate Defendants objected to the Report,[7] asserting that the Special Master: "(1) exceeded the scope of his mandate to produce a forensic report by developing and attempting to prove a 'two-tier RICO liability theory of the case' in order to reach his ultimate conclusion that the Corporate Defendants, their principals and indeed their professionals are guilty of criminal conduct; (2) made numerous inaccurate factual and legal statements and conclusions; and (3) deprived the Corporate Defendants of their due process rights by relying upon an incomplete evidentiary record which has not been seen or challenged by the Corporate Defendants." **[DE 883, pp. 2-3]**.

The final set of objections was filed by *pro se* Defendants Frederick and Derek Elliott ("the Elliotts"), who joined in the Corporate Defendants' Objections[8], and supplemented them with objections of their own. In their Objections, the Elliotts complain that "the Special Master has completely prejudiced [their] defense in this case" and "denied [them] due

---

[7] The "Corporate Defendants" self-identify as: "EMI Resorts Inc., EMI Sun Village Inc., HSV Operadora de Hoteles, S.A., EMI Resorts Management, S.A., EMI Resorts (S.V.G.) Inc., EMI Cofresi Developments Inc., Sun Village Juan Dolio Inc., Promotora Xara, S.A., Elliott Miches Holdings Inc., Inversiones Yubaso, S.A., Inmobiliaria Lirios Del Tropico, S.A., Inmobiliaria Canadaigua, S.A., HSV Holdings, S.A., Desarrollos Mirador Cofresi, S.A., Tenedora HSV [B.P.], S.A., Villa Santa Ponca, S.A., Bertus Management Inc., CCW Dominicana, S.A, Cofresco Holdings Inc., Inmobiliaria Moncey, S.A., Cellwave Networks Limited and WWIN International Limited." **[DE 883, p.1]**

[8] At the February 1st hearing, the Corporate Defendants' new counsel advised that they were being funded by Derek Elliotts' mother. Both Elliotts claim, and have attested under oath, that they are without assets. The volume of pleadings now filed by the Corporate Defendants, which the *pro se* Elliotts join, suggest that a significant amount of attorneys' fees are continuing to be spent in this case. It also is interesting to note that the Elliotts' former attorney, who sought to withdraw from these proceedings because of ethical circumstances, is back in representing the DMK Defendants. Upon inquiry, the attorney assured me he had no "ethical" issues. The *Hofmann* Plaintiffs, meanwhile, continue to be skeptical about the attorneys' ethical representation and who is actually funding them. I leave this issue for another day.

11

process" in a manner that went "beyond the scope of his duties and beyond the scope of this litigation." **[DE 884, pp. 1-2]**.  The Elliotts further contend that "[i]t is now time to remove the Special Master" and that the Report "must surely prejudice any judge or court from even hearing the matter if [it] has been entertained or even read by such parties," which I construe as a Motion to Disqualify the Special Master and the Undersigned.[9]  *Id.* at 3-4.  Finally, the Elliotts request that all documents and materials be "returned to the Corporate Defendants immediately," that the Special Master provide them with a detailed accounting, that certain funds be released, and that their Objections be posted on Plaintiffs' website.  *Id.* at 2, 7.

      D.    *Defendants' Procedural Due Process Objections*

A common theme that echoes loudly throughout the Defendants' Objections is that their procedural due process rights were violated when the Special Master issued his Report "without permitting the DMK Defendants and the Elliott individual and corporate Defendants the opportunity to be heard." **[DE 859, p. 9]**; *see also* **[DE 883, pp. 2-3]** (Special Master "deprived the Corporate Defendants of their due process rights by relying upon an incomplete evidentiary record which has not been seen or challenged by the Corporate Defendants."); **[DE 884, pp. 1-2]** (Special Master "denied [Elliotts] due process" and made "unsupported allegations without any judicial process.")  Having carefully considered Defendants' objections, the applicable law, and the totality of the circumstances, I conclude that Defendants have not been unconstitutionally deprived of

---

[9]Because the Elliotts are proceeding *pro se*, I liberally construe their pleadings.  *See Timson v. Sampson*, 518 F.3d 870, 874 (11th Cir. 2008) (noting that pleadings and briefs filed by *pro se* litigants are to be liberally construed).

due process of law for the reasons that follow.

The Supreme Court of the Untied States has "explained that 'procedural due process[10] imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process clause of the Fifth or Fourteenth Amendment," and generally "requires notice and an opportunity to be heard before any governmental deprivation of a property or liberty interest." *Grayson v. King*, 460 F.3d 1328, 1340 (11th Cir. 2006) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 901 (1976)); *United States v. Powerstein*, 185 Fed. Appx. 811 (11th Cir. 2006) (quoting *Zipperer v. City of Fort Myers*, 41 F.3d 619, 623 (11th Cir.1995). However, where a party cannot demonstrate an *actual* deprivation of "a constitutionally-protected interest," there can be no due process violation – in other words, "a risk of deprivation" will not suffice. *Mobley v. Hicks*, 291 Fed. Appx. 217, 219 (11th Cir. 2008) (noting that in order to demonstrate a deprivation of interest for purposes of a procedural due process analysis, a party "must allege a deprivation of a constitutionally-protected interest, not merely a risk of deprivation.") (cites and quotes omitted); *Stapp v. Avoyelles Parish School Bd.*, 545 F.2d 527 (5th Cir. 1977) ("[p]rior to any consideration of the sufficiency or necessity of procedural due process protections, [party] must demonstrate deprivation of an interest in

---

[10]The substantive component of the Due Process Clause "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.' " *Collins v. City of Harker Heights*, 503 U.S. 115, 125, 112 S. Ct. 1061 (1992). Substantive due process applies to "those rights that are 'fundamental' – rights that are 'implicit in the concept of ordered liberty,' " such as the right to be free from state-sponsored torture. *Skinner v. City of Miami*, 62 F.3d 344, 347 (11th Cir.1995) (quoting *Palko v. Connecticut*, 302 U.S. 319, 325-26, 58 S. Ct. 149 (1937) (noting that the Due Process Clause must at least "give protection against torture, physical or mental.")). Defendants' objections to the Special Master's Report invoke principles of procedural due process.

"life, liberty, or property" within the protections of the Due Process Clause.)

While the Defendants' Objections do not specifically point to a constitutionally-protected interest of which they have been deprived as a result of the Special Master's Report, it appears that their complaints are three-fold: (1) that they have been denied of their constitutionally-protected right to a fair trial[11] by the Special Master's usurpation of "the duties and obligations of the Plaintiffs, this Court, and the putative jury";[12] (2) that they have been "defame[d]" by the Report which "read[s] like a prosecutor's bill of indictment;"[13] and (3) that the Court-ordered removal of records and documents[14] from the resort unconstitutionally deprived the Corporate Defendants of their property interest in those documents.[15]

Because I have no intention of adopting the Special Master's findings and conclusions at this juncture, or allowing the Report to be presented to the jury, *see* Section II(F), *infra*, I summarily reject the argument that the Special Master's Report deprives Defendants of their constitutionally-protected right to a fair trial.  I order that the Special Master's Report, as such, will play no direct role in the ultimate trial of this action.  Of

---

[11] *See Ellis v. Capps*, 500 F.2d 225, 227 (5th Cir. 1974) (noting that "serious due process problems" are raised when a a defendant is deprived of a "reasonable opportunity to refute grave allegations brought against him in a civil suit.").

[12] **[DE 859, p. 7];** *see also* **[DE 883, p. 3]** ("due process demands that any de novo review of the facts alleged by the Special master in his Report come only at trial on the underlying merits.")

[13] **[DE 884, pp. 1-2]**.

[14] **[DE 909]**; **[DE 700]** (adopting and affirming Special Master's Report and Recommendation requesting authorization to remove certain documents and records in order to prevent their removal and/or destruction).

[15] *See* **[DE 884, p. 2]; [DE 883, p. 23, n. 17]**.

course, this does not mean that the Manager may not be called as a witness, or that the documents associated with the Special Master's Report may not be offered into evidence; however, Plaintiffs will not be permitted to rely on the Report in lieu of having to carry its evidentiary burden.  How these matters will eventually work out remains to be seen, particularly given that the documents at issue have been subpoenaed by the United States Securities and Exchange Commission as part of its ongoing investigation into matters associated with this case.

I also reject Defendants' defamation argument.  Even if the contents of the Special Master's Report were ultimately proven to be false, defamation by a government actor, without more, is insufficient to establish a due process violation.[16]  While the United States Supreme Court has recognized the "drastic effect of the 'stigma' which may result from defamation by the government in a variety of contexts, this line of cases does not establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause."  *Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 1161 (1976) (emphasis added).  This constitutional rule is known as the "stigma-plus" test

---

[16]Nor could any such alleged defamation serve as the basis for a tort action against the Special Master given that all of his actions, including the preparation of the Report, were done under my supervision and pursuant to my Orders.  *See Property Management & Investments, Inc. v. Lewis*, 752 F.2d 599, 603 (11th Cir. 1985)  (concluding that receiver was entitled to judicial immunity despite allegedly having "maliciously and deliberately releas[ed] news reports to the media . . . that were false and defamatory.");  *Boullion v. McClanahan,* 639 F.2d 213, 214 (5th Cir. Unit A 1981) (holding that court-appointed trustee was entitled to immunity in tort actions based on actions taken while serving as trustee, regardless of error or malice, because he "was acting under the supervision and subject to the orders of the bankruptcy judge . . . [acted] as an arm of the Court, [and] sought and obtained court approval of his actions.") (per curiam); *Wilson v. Bush*, 196 Fed. Appx. 796, 799 (11th Cir. 2006) (concluding that special masters are entitled to judicial immunity for acts performed in the scope of their appointment).

and is consistently applied in this Circuit. *Cannon v. City of West Palm Beach*, 250 F.3d 1299, 1302 (11th Cir. 2001 (noting that "a plaintiff claiming a deprivation based on defamation by the government must establish the fact of the defamation 'plus' the violation of some more tangible interest before the plaintiff is entitled to invoke the procedural protections of the Due Process Clause.") Here, the Objecting Defendants (i.e., the Elliotts, the Corporate Defendants, and the DMK Defendants) have not established that the issuance of the Report damaged "some more tangible interest" aside from reputation, and, as such, cannot demonstrate that the Special Master's Report, even if defamatory, violated their procedural due process rights. *Id.*

Nor can the Corporate Defendants or the Elliotts claim that they have been deprived of their corporate records without due process of law, for they expressly consented to the expansive powers bestowed upon the Special Master through the Monitor Order. *See* **[DE 528]**. As detailed above, *see* Section II(A), *supra*, the Monitor Order provided the Special Master with the "full power and authority necessary to carry out" investigations regarding "monies, property, assets, records or other tangible things that the Monitor may believe have wrongfully, illegally, or otherwise improperly been misappropriated or transferred." *Id.* at 2-4. This grant of authority – to which the Elliott Defendants consented – is quite broad, and will not be construed so narrowly as to preclude the removal of sensitive documents and records for safe-keeping on an emergency basis per court order, especially where those documents were believed to be necessary and critical to the Special Master's court-ordered investigations and were in danger of spoliation.[17]

_____

[17]In a recent filing, the Elliotts assert that the Special Master's removal of documents "violated the Dominican Code of Commerce" and other Dominican laws, and that such removal

Additionally, even if it could be argued that the removal of documents from Cofresi did not fall within the purview of the agreed-to Monitor Order (which is not the case), the emergency removal of critical documents and records would still not rise to the level of a due process violation.  Due process, as the Supreme Court has often stated "is a flexible concept that varies with the particular situation."  *Zinermon v. Burch*, 494 U.S. 113, 127, 110 S.Ct. 975 (1990).  In determining what procedural protections the Constitution requires in a particular case, courts are instructed to weigh several factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* (citing *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893 (1976)).

While applying this test usually requires "an opportunity for some kind of hearing prior to the deprivation of a significant property interest. . . [the Supreme] Court has recognized that where the potential length or severity of the deprivation does not indicate a likelihood of serious loss and where the procedures underlying the decision to act are sufficiently reliable to minimize the risk of erroneous determination, government may act

---

was thus improper under the Monitor Order which states that "its terms are expressly intended to give the Monitor the full power and authority necessary to carry out the duties . . . to the extent the provisions of [the Monitor] Order are not inconsistent with or forbidden by the laws of any foreign jurisdiction." **[DE 929]**; **[DE 528, p. 3]**.  However, a review of the record indicates that the Elliott Defendants have not provided the Court with any authenticated foreign evidence regarding Dominican law to that effect.  Even if such evidence were offered, it would not trump the inherent power of this Court to act given the circumstances. The Defendants always retain the right to seek further hearing to copy the documents for legitimate business purposes, although now they have to deal with the Securities and Exchange Commission as well as this Court.

without providing additional advance procedural safeguards." *Memphis Light, Gas and Water Division v. Craft*, 436 U.S. 1, 20, 98 S.Ct. 1554 (1978). Such is the case here. First, "the initial hardship to the [Elliott Defendants] is limited," as they were only temporarily deprived of documents and records that could have been readily duplicated and/or returned to them upon request. *Mitchell v. W. T. Grant Co.,* 416 U.S. 600, 619, 94 S.Ct. 1895 (1974). Second, the risk of an erroneous deprivation of such interest was minimal given that the "process proceed[ed] under judicial supervision and management." *Mitchell*, 416 U.S. at 619; and finally, the Court's interest in preserving the documents at issue was overwhelming, particularly given the likelihood of spoliation,[18] the allegations of criminality, and the immediate and irreparable threat to Special Master Scott's court-ordered investigation. As such, I conclude that this qualifies as one of the rarely-presented situations where Special Master Scott and I were constitutionally permitted to act without providing additional advance procedural safeguards to the Elliott Defendants.[19]

---

[18] Indeed, it was brought to my attention that agents of the Corporate Defendants had intentionally destroyed potentially probative documents. *See* **[DE 883-2]**; **[DE 832]**. As a result of these egregious acts, this Court was vested with the inherent power to take the necessary actions to "conduct an independent investigation in order to determine whether it [was] the victim of fraud," including the immediate sequestration and preservation of sensitive evidence subject to further spoliation. *See Chambers v. Nasco*, 501 U.S. 32, 44 11 S.Ct. 2123 (1991). While I recognize that my "inherent powers must be exercised with great restraint and discretion," I carefully considered my options prior to authorizing the sequestration of the documents and was unable to fashion any other remedy that would ensure the preservation of the irreplaceable documents and records at issue. *Id.*

[19] Buttressing my conclusion that there has been no due process violation is the fact that the Objecting Defendants have not alleged the absence of a post-deprivation remedy. "All that due process requires . . . is a post-deprivation means of redress for property deprivations satisfy[ing] the requirements of procedural due process." *McKinney v. Pate*, 20 F.3d 1550, 1563 (11th Cir. 1994) (quotes omitted). As I made clear on numerous occasions, the Defendants were free to request that the sequestered documents (or copies thereof) be returned to them, provided that they advance the expenses of duplication so as to ensure that critical evidence would not be destroyed. No such requests were made.

18

E.      *The Special Master's Duties Regarding Perceived Criminal Misconduct*

In addition to the alleged due process violations outlined above, the Objecting Defendants assert that the Special Master "exceeded the scope of his mandate"[20] by preparing a Report that outlines various instances of potentially criminal conduct.   I disagree.  Having reviewed the Report and the applicable law, I conclude that the Special Master acted within his mandate and in accordance with the responsibilities he assumed as a quasi-judicial officer of this Court.

It is well-settled that when a special master accepts an appointment by the Court, the special master assumes the duties and obligations of a judicial officer.  *In Re Gilbert*, 276 U.S. 6, 9 (1928).  Further, with certain exceptions, special masters are subject to the Code of Conduct for United States Judges.  Fed. R. Civ. P. 53, Advisory Committee's Notes, 2003 Amendments, Subdivision (a)(2) and (3)).  While "[t]he Code of Conduct neither prohibits nor requires judges to report perceived criminal misconduct to the appropriate authorities . . . a judge should take appropriate steps to bring [a] matter to the attention of the authorities" if the "perceived transgression is of such a nature as to create a likelihood that failure to report it would reflect adversely upon the judiciary."  *Code of Conduct for United States Judges*, Compendium § 1.1(c) (2009).  Moreover, "[w]here a judge in the course of judicial duties obtains information suggesting that a crime has been committed in a foreign country, it is appropriate to report the matter to the United States Attorney's Office for such referral as the latter may deem warranted."  *Id.* at § 1.1(b)

---

[20] I unequivocally reject the DMK Defendants' assertion that there was no statutory basis for the appointment for a Special Master in this case.  *See* Fed. R. Civ. P. 53(a)(1)(C); *see also* Section II(A), *supra*.

(2009).  Here, the Special Master obtained information in the course of his quasi-judicial duties suggesting that serious crimes had been committed, both domestically and abroad. As such, by preparing his Report, he did exactly what the Code of Conduct contemplates: he took steps to bring the matter to my attention so that an appropriate referral could be made.

While I certainly understand the concerns of the Objecting Defendants insofar as the Special Master's Report might be perceived as making "allegations of criminal conduct like a prosecutor," **[DE 883, p. 3]**, I emphasize that the Report's contents are not being adopted by this Court at this time, and that the referral of these matters to the appropriate authorities will be made in a neutral fashion with the appropriate disclaimers as to the preliminary nature of the Report (i.e., the limited information upon which its conclusions rest). *See* Code of Conduct for United States Judges, Compendium § 1.1(d) (instructing that "[w]hen a judge decides to take action in response to perceived misconduct, the reference to appropriate authorities should be made in a neutral fashion").  Moreover, in the interests of justice and fairness, I assure the Objecting Defendants that any referral to the criminal authorities will be accompanied by their objections to the Special Master's Report.

> F.    *Because This Court is Not Adopting or Affirming the Special Master's Report, There is No Need to Rule on Defendants' Objections to the Special Master's Factual Findings and Legal Conclusions*

Contrary to Defendants' assertions, I have no intention of adopting or affirming the factual findings and legal conclusions set forth in the Special Master's Report.  *See* **[DE 859 p. 12]** ("Special Master's findings of fact regarding the DMK Defendants cannot be

adopted because of the lack of a substantial evidentiary basis . . . and the gross procedural violations."). Nor will I pass judgment on the truthfulness of the statements contained therein, or the civil or criminal liability of any person, for these sorts of determinations are first to be made by investigating governmental agencies and prosecutors, and later, as warranted, by Grand Juries and Petit Juries. However, having reviewed the Special Master's Report and the entire record in the cause to date (with which I am familiar), I am left with the firm belief that criminal activities warranting further investigation have occurred in connection with a matter over which I preside. Accordingly, I will take the necessary steps consistent with this Order to bring these matters to the attention of the appropriate authorities.

> G.   *Frederick and Derek Elliotts' Requests for (1) Documents, (2) a Detailed Accounting, (3) the Release of Funds, and (4) the Posting of their Objections on Plaintiffs' Website.*

In their Objections to the Special Master's Report, Frederick and Derek Elliott request that (1) all documents and materials be "returned to the Corporate Defendants immediately"; (2) that the Special Master provide them with a detailed accounting of certain funds; (3) that certain funds be released; and (4) that their Objections be posted on Plaintiffs' website. *Id.* at 2, 7. The Elliotts' request to return the documents is now moot because all of the documents are in the process of being turned over to the United States Securities and Exchange Commission in accordance with a subpoena **[DE 947]**.[21] Therefore, I deny the request to turn over documents without prejudice. Such request may

---

[21] The subpoena to the Special Master states, in part: "The staff of the Securities and Exchange Commission is conducting an investigation in the matter identified above. The enclosed subpoena has been issued to you as part of this investigation. The subpoena requires you to give us documents and provide sworn testimony." **[DE 947]**.

be re-filed if and when the documents are returned to the possession of the Special Master. The Special Master is unable to perform any detailed accounting without the records under subpoena, and, in any event, no money remains to pay the Special Master for such an accounting.

The Elliotts' remaining objections are without merit, with one exception. I find no basis to release any funds to the Elliotts, particularly given my findings of their contempt as later addressed in this Order. I agree, however, with the Elliotts' request that their objections to the Special Master's Report should be posted on the Court's website along with the Special Master's Report.

H. *Frederick and Derek Elliotts' Request for the Disqualification of the Undersigned and the Special Master*

In their Objections to the Special Master's Report, the Elliotts contend that the Special Master and the Undersigned should be disqualified because the nature of the Report "must surely prejudice any judge or court from even hearing the matter if [it] has been entertained or even read by such parties." **[DE 884, pp. 1-2]**.  Apparently in agreement with the Elliotts as to this issue, the Corporate Defendants adopted this argument and made an *ore tenus* request for the Special Master's removal at oral argument. **[Feb. 1, 2010 Tr. at 13:19 - 13:24]**.  Having carefully considered the contents of the Report and Defendants' arguments, I agree that the Special Master's "impartiality might reasonably be questioned" and that he should therefore be disqualified from performing "judicial functions" in connection with these proceedings as a Special Master,

but shall not be disqualified from performing administrative or monitoring functions.[22]
*Jenkins v. Sterlacci,* 849 F.2d 627, 630-31 (D.C. Cir. 1988) (noting that "anyone performing judicial functions . . . including special masters" who perform "duties functionally equivalent to those performed by a judge" should be disqualified "in any proceeding in which his impartially might reasonably be questioned").  Mr. Scott's continuation as the Court's monitor is necessary and vital to these proceedings, and is not impermissible given that his monitoring and administrative duties do not involve the exercise of any judicial functions.

Regarding the Elliotts' request to disqualify the Undersigned, I conclude that recusal is not warranted at this juncture for a number of reasons.  First, the Elliotts have not set forth any facts demonstrating that "an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt about [my] impartiality," such that disqualification is required pursuant to 28 U.S.C. § 455(a).  *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1524 (11th Cir. 1988).  Second, the Elliotts have not adequately alleged either: (a) the existence of bias on my part that stems "from extrajudicial sources"; or (b) "such pervasive bias and prejudice that it unfairly prejudices one of the parties."  *Ray v. Equifax Information Servs., LLC*, 327 Fed. Appx. 819, 825 (11th Cir. 2009) (cites and quotes omitted).  Of course, if the Elliotts (or any other Defendants) truly believe that I have "a personal bias or prejudice either against [them] or in favor an adverse party" as a result of the Special Master's Report, this Order, or for any other conceivable reason,  they are free to file an affidavit to that effect pursuant

---

[22] For example, this shall in no way impact Mr. Scott's ability to carry out the ResortCom analysis authorized by my November 30, 2009 Order.  *See* **[DE 853]**.

to 28 U.S.C. § 144. *Exime v. E.W. Ventures, Inc.*, 2009 WL 1423345, *4 (S.D. Fla. May 20, 2009) (quoting 28 U.S.C. § 144 and expounding procedures for a Section 144 recusal request).

I.    *Extension of the Monitor Order as a Function of Civil Contempt*

The last issues I need to address in connection with Defendants' Objections to the Special Master's Report are Defendants' requests that the restrictions imposed upon them by the Monitor Order be removed. *See* **[Feb. 1, 2010 Tr. at 13:16 - 13:18; 25:20 - 25:24; 51:16 - 51:21]**. In support of these requests, Defendants assert that the Monitor Order is unduly restrictive, excessively broad in scope, and unnecessary given the circumstances. *See generally id.* at 13-51. Having considered Defendants' arguments, I conclude that a Monitor is still necessary and – as a function of Defendants' contemptuous behavior – expressly order the Objecting Defendants to continue complying with the Monitor Order pending further order of this Court.

Civil contempt is remedial in scope to enforce compliance with a court order, and "[d]istrict courts enjoy wide discretion to fashion an equitable remedy for [civil] contempt that is appropriate to the circumstances." *U.S. v. City of Miami*, 195 F.3d 1292, 1298 (11th Cir. 1999) (cites and quotes omitted). Under Eleventh Circuit case law, civil contempt remedies "may serve one of two broad purposes: (1) coercing the contemnor to comply with a court order, or (2) compensating a party for losses suffered as a result of the contemptuous act." *Id.* "In serving these ends, a court's civil contempt power is measured solely by the " 'requirements of full remedial relief.'" *Id.*

Unlike criminal contempt proceedings, which are commenced by the court and are

punitive in nature, "[c]ivil contempt is designed to coerce the contemnor to comply with a court order, and a civil contempt action is brought by a private party, not the court." *Wolfe v. Coleman*, 681 F.2d 1302, 1306 (11th Cir. 1982).  Moreover, once a court finds a party to be in contempt, "[t]he contemnor always has the ability to purge himself of contempt by obeying the court order." *Id.*

In the instant case, contempt-related issues have been front and center since May of 2009, when the *Hofmann* and *Aguilar* Plaintiffs filed their first motion for an order to show cause why the Elliott Defendants should not be held contempt of court.  *See* **[DE 334]**.  In that motion, Plaintiffs alleged that the Elliott Defendants violated my April 15, 2009 order **[DE 205]** by initiating certain transfers out of a DMK trust account for purposes "other than completion of the Juan Dolio hotel."  **[DE 334]**.  Although the motion was briefly discussed at a hearing, I deferred ruling on it  **[May 19, 2009 Tr. at 117:24 - 118:2]**.

Ultimately, however, the contempt issues came to a head when – after a number of additional filings by Plaintiffs alleging contemptuous conduct on the part of the Elliott Defendants *see e.g.,* **[DE 432]; [DE 499]** – the Special Master advised me through a series of Reports and Recommendations of various acts (and omissions) undertaken by the Elliott Defendants in violation of the Monitor Order.  *See e.g.,* **[DE 563]**; **[DE 566]**; **[DE 585]**. Among the allegedly contemptuous acts identified in the Special Master's Reports were: (1) that the Elliott Defendants had "transferred, or caused a transfer, of a total of $97,349.33 from their Resortcom accounts" on August 5, 2009 without disclosure or authorization, **[DE 585, p. 5]**; and (2) that the Elliott Defendants caused more than $100,000 to be transferred in and out of Elliott-controlled bank accounts on July 28 and 29,

2009 without disclosure or authorization  **[DE 566, p. 6]**.  As a result of the amassing

allegations of contemptuous behavior on the part of the Elliott Defendants, I set a show

cause hearing for August 6, 2009.  *See* **[DE 565]**.

At the August 6, 2009 show cause hearing, both Frederick and Derek Elliott were

questioned extensively regarding the alleged violations of the Monitor Order.  *See* **[DE**

**594]**.  After hearing testimony, argument, and considering the evidence, I found the Elliotts

and the Corporate Defendants[23] in contempt of court for admitted violations of the express

terms of the Monitor Order.  *See* **[Aug. 6, 2009 Tr. at 26:6 - 26:14]** (Frederick Elliott

admitting to undisclosed transfers of Elliott Defendant funds in violation of Monitor Order);

**[DE 603]**.  I also set forth various conditions that Defendants could meet to purge the

contempt, and set a follow-up hearing for September 16, 2009 to determine whether the

contempt had been purged.  *Id.*  It was not, nor has it been to this day.  *See* **[DE 714, p.**

**4]**.

In the wake of the aforementioned contempt proceedings, Plaintiffs brought yet

another instance of potentially contemptuous behavior to the Court's attention during a

hearing on September 30, 2009.  Through the questioning of Frederick Elliott at that

hearing, Plaintiffs' counsel elicited information regarding a recent transfer of the Cofresi

Cove, at least two villas, and two apartment complexes from an Elliott-related company to

Inversiones Werden, S.A ("Werden"), a Dominican business entity that Plaintiffs suspected

---

[23]  This finding of contempt, which has not yet been purged, *see* **[DE 714, p. 4]; [Sept. 30 Tr. at 46:8 - 47:2]**, encompassed both the Elliotts and the Corporate Defendants given their "one and the same" relationship.  *See Spectacular Venture, L.P. v. World Star Int'l, Inc.,* 927 F.Supp. 683, 684-85 (S.D.N.Y. 1996) (finding corporation and principal to be "one and the same" for purposes of contempt analysis).

was affiliated with the DMK Defendants.  **[Sept. 30, 2009 Tr. at 17-19]**.  After examining Mr. Elliott, Plaintiffs' counsel questioned Mr. De Marchena regarding the relationship between Werden and the DMK Defendants.  In response to this line of questioning, Mr. De Marchena denied any present affiliation and testified that his law firm had merely incorporated Werden and promptly thereafter "transferred [their] shares" to a gentleman named Mr. Aleman.  **[Sept. 30, 2009 Tr. at 30:15 - 30:20]**.

Following this hearing, however, a number of submissions raised serious questions about the veracity of Mr. De Marchena's testimony.  Specifically, on October 26, 2009, Plaintiff filed a Dominican governmental certificate[24] indicating that: (1) Werden's address is the office address of DMK; (2) Werden's telephone number is the telephone number for DMK; (3) two of Werden's shareholders are DMK attorneys; and (4) Werden's secretary is Mr. De Marchena.  *See* **[DE 795]**.  Second, and more importantly, was the DMK Defendants' response to Plaintiffs' filing, which effectively conceded that Mr. De Marchena was less than candid when questioned about the Werden-DMK relationship during the September 30, 2009 hearing.  Notably, the DMK Defendants' response admitted that "the transfer of [Werden] shares [had] not been perfected" as of November 11, 2009.  **[DE 834, p. 2]**.  Thus, notwithstanding Mr. De Marchena's testimony to the contrary, the DMK Defendants were still affiliated with Werden at the time it took title to the properties at issue.

In light of the foregoing, I now find by clear and convincing evidence that the DMK Defendants violated paragraph eight of the Monitor Order by taking actions affecting

---

[24] This filing was labeled a "Notice" but included a request that the Court hold the DMK Defendants in contempt for willful violations of the Monitor Order. *See* **[DE 795]**.

property, assets, or estates of the Elliott Defendants "without the advice of and consent of the Monitor." *See* **[DE 528, pp. 5-6]**. Specifically, I conclude that the DMK Defendants, by virtue of their relationship with Werden, participated in the transfer of Elliott Defendant property when Werden took title to Cofresi Cove, the villas, and the apartment complexes. *See* **[DE 751, pp. 16-19]; [DE 528, p. 6]**.[25] Accordingly, the DMK Defendants are in contempt of court and subject to the equitable remedy set forth below.

As noted above, Eleventh Circuit case law provides that I have "wide discretion to fashion an equitable remedy for [civil] contempt that is appropriate to the circumstances." *City of Miami*, 195 F.3d at 1298. Here, my primary concern is to ensure strict compliance with the Monitor Order, the enforcement of which is critical to prevent the fraudulent transfer and/or improper dissipation of Elliott Defendant assets tied to investor funds. Given this goal and the totality of the circumstances, I conclude that an appropriate remedy for Defendants' contemptuous conduct is for the Monitor to continue in his present capacity in order to ensure that the provisions of the Monitor Order are strictly complied with by all parties thereto. Accordingly, I reject Defendants' requests that the Monitor Order be lifted. Instead, the Monitor Order shall remain in full force, and the Monitor is expressly authorized and ordered to continue carrying out the functions outlined therein. Any perceived violation of the Monitor Order shall be promptly reported to this Court in the form of a "Monitor's Report."

---

[25] I do not pass judgment as to the willfulness of the DMK Defendants' contemptuous conduct. *See McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497 (1949) (noting that "[t]he absence of wilfulness does not relieve from civil contempt").

III.    **Other Pending Matters**

A.    *Non-Party Jaclinn Pullman's Motion to Intervene*

On October 14 and 21, 2009, *pro se* non-party Jaclinn Pullman filed two motions to intervene and to add sixty-five purportedly indispensable parties as Defendants to this action.  *See* **[DE 781]**; **[DE 792]**.  In support of her motions, Ms. Pullman claims that, "like 'Hofmann' and the admitted 'Hofmann' interveners . . .[she] is an investor in the now defunct Elliott Management Inc. ("EMI") resorts in the Dominican Republic which are the properties at issue" in this suit. **[DE 781, p. 1]**.  Plaintiffs and the Elliott Defendants oppose Ms. Pullman's motions, asserting that her intervention would be improper given the totality of the circumstances.  *See* **[DE 801]**; **[DE 823]**.

Intervention of right is governed by Federal Rule of Civil Procedure 24(a).  Pursuant to Rule 24(a), a party who does not possess "an unconditional right to intervene by a federal statute" must be permitted to intervene in an action if they can establish that: (1) the application to intervene is timely; (2) the party has an interest relating to the property or transaction which is the subject of the action; (3) the party is so situated that disposition of the action, as a practical matter, may impede or impair the party's ability to protect that interest; and (4) the party's interest is represented inadequately by the existing parties to the suit.  *See* Fed. R. Civ. P. 24(a); *Fox v. Tyson Foods, Inc.,* 519 F.3d 1298, 1302-03 (11th Cir. 2008).

Permissive intervention, on the other hand, is governed by Federal Rule of Civil Procedure 24(b).  Pursuant to Rule 24(b), "[a] party seeking to intervene . . . must show that: (1) [the] application to intervene is timely; and (2) [the party's] claim or defense and

29

the main action have a question of law or fact in common." *Chiles v. Thornburgh,* 865 F.2d 1197, 1213 (11th Cir. 1989) (citation omitted).  Furthermore, a "district court has the discretion to deny intervention even if both of those requirements are met, and its decision is reviewed for an abuse of discretion." *Id.*

As is clear from the foregoing, any request to intervene must be "timely," regardless of whether intervention is sought as a matter of right pursuant to Rule 24(a) or permissively pursuant to Rule 24(b).  In determining whether Pullman's intervention request was timely, I "must consider the length of time during which [Pullman] knew or reasonably should have known of [her] interest in the case before moving to intervene, the extent of prejudice to the existing parties as a result of [her] failure to move for intervention as soon as [she] knew or reasonably should have known of [her] interest, the extent of prejudice to [Pullman] if [her] motion is denied, and the existence of unusual circumstances militating either for or against a determination that [her] motion was timely." *Id.* (citation omitted). I must also keep in mind that "[t]imeliness is not a word of exactitude or of precisely measurable dimensions [and that] [t]he requirement of timeliness must have accommodating flexibility toward both the court and the litigants if it is to be successfully employed to regulate intervention in the interest of justice." *Id.* (citation omitted).

Having carefully considered these factors and the totality of the circumstances, I conclude that Pullman's request to intervene was not timely filed.  First, Pullman was aware of her interest in the case as early as March 16, 2009, when she sent correspondence to this Court regarding her relationship with the subject-matter of this action.  *See* **[DE 63]**.[26]

---

[26] Pullman's argument that her motion is timely because "she filed it almost immediately after learning that she had an investment loss as a result of the Cofresi resort being foreclosed"

Despite this knowledge, she did not attempt to intervene until approximately seven months and seven-hundred docket entries later, even after being admonished by Plaintiffs for not having "taken any affirmative steps to join this litigation as a party." **[DE 84]**.   Second, Pullman's attempt to add an additional sixty-five Defendants would prejudice the Plaintiffs, who have actively litigated this case for the last eight months and have repeatedly expressed concerns regarding their ability to finance this suit as is; and finally, while Pullman claims that she would be prejudiced by having to litigate any of her claims independent of this action, she provides little, if any, support for this contention.[27]

Accordingly, I conclude that Pullman has failed to adequately establish that her motion to intervene was timely filed.  *See United States v. Borge*, 249 F.R.D. 387, 388 (S.D. Fla. 2008) (noting that "the Movant bears the burden of establishing his purported right to intervene.")

B.      *Plaintiffs' Objections Regarding Laptop Imaging Expenses*

Another issue that has been pending for some time is whether the *Hofmann* and *Aguilar* Plaintiffs should be absolved of their responsibility to bear "the burden and cost of copying the contents of the Elliotts' laptops" as performed by Ikon Office Solutions, Inc. ("Ikon").  *See* **[DE 737]** (order referring laptop issues to Magistrate Judge McAliley and imposing burden and cost of laptop mirroring on the *Hofmann* and *Aguilar* Plaintiffs).

---

is unavailing, for there is no question that the value of her timeshare interest had been decimated long before her motion was filed in October of 2009.  *See* **[DE 839, p. 8]**.

[27] In fact, it appears that Ms. Pullman has already attempted to sue "the Elliotts Clients Committee," James Catledge, and others approximately three months prior to filing this motion, but abandoned her efforts after being instructed by Judge Jordan to amend her complaint to (1) state a claim; and (2) allege a valid basis for the exercise of subject matter jurisdiction.  *See* S.D. Fla. Case No. 09-CV-21842-AJ, [DE 3].

On October 1, 2009, Magistrate Judge McAliley held two status conferences regarding the duplication (a.k.a., "mirroring") of the hard drives of the Elliotts' laptop computers. *See* **[DE 753]**. After the first status conference, Plaintiffs engaged Humberto Morchano, a Project Manager at Ikon, to mirror the hard drives and were ordered by Magistrate Judge McAliley to cover the costs of the mirroring process in accordance with my prior order. *Id.*; **[DE 754]**. On October 7, 2009, the *Hofmann* and *Aguilar* Plaintiffs filed Joint Objections to Magistrate Judge McAliley's order, arguing that the "Plaintiffs should not be required to pay for the expedited service . . . [because] had the Elliotts not insisted on the immediate return of their laptops, Plaintiffs would have had a reasonable amount of time to shop around for the best deal regarding the mirroring." **[DE 762, p. 3]**.

As I expressly stated in my October 1, 2009 Order, "the burden and cost of copying the contents of the Elliotts' laptops shall be borne by the Plaintiffs." **[DE 737]**. I see no reason to reconsider this ruling in light of the "expedited nature of the mirroring," *see* **[DE 762]**, as it was readily apparent at that time I issued my order that there were "extraordinary time constraints" and that the imaging process would need to be done "as quickly as possible." **[DE 737]**. Accordingly, Plaintiffs' Joint Objections are overruled. The *Hofmann* and *Aguilar* Plaintiffs[28] shall each compensate Ikon for fifty percent of the laptop mirroring costs by no later than March 1, 2010.

---

[28]*See Thomas v. Early County, Ga.*, 2010 WL 27970 (11th Cir. Jan. 7, 2010) (noting that voluntary dismissals do not divest district court of jurisdiction to decide matters pertaining to fees and costs).

**IV.    Conclusion**

Based on the foregoing, it is hereby  ORDERED AND ADJUDGED that:

1.    The Report and Recommendation Following Preliminary Forensic Analysis **[DE 832]** is neither ADOPTED NOR AFFIRMED.  Instead, this Court will take appropriate action to refer the Report and the Defendants' Objections thereto to the appropriate authorities in accordance with the terms of this Order.  The authorities to be contacted are those listed in the Special Master's Report.

2.    The Special Master's recommendation to re-freeze the DMK Defendants' U.S. Accounts is DENIED.

3.    The Special Master's recommendation regarding the production of documents by James Catledge and his Impact-related entities is DENIED.

4.    The Special Master's recommendation regarding the re-freezing of the ResortCom accounts is DENIED AS MOOT.  *See* **[DE 853]**.

5.    Jaclinn Pullman's Motions to Intervene **[DE 792]; [DE 781]** are DENIED.

6.    Frederick and Derek Elliott's Request for Documents and Records is DENIED WITHOUT PREJUDICE AS MOOT.

7.    Defendants' Requests to Disqualify the Special Master are GRANTED IN PART.

    a.    The Special Master shall no longer perform any judicial functions, but shall continue to perform monitoring and administrative functions in accordance with the terms of this Order and prior orders of this Court.

    b.    Frederick and Derek Elliott's Request to Disqualify the Undersigned is DENIED without prejudice.

33

8.  The Clerk is directed to post this Order, as well as Defendants' Objections to the Special Master's Report **[DE 859]; [DE 883]; [DE 884]**, on this Court's website alongside the Special Master's Report **[DE 832]**.

9.  The Clerk is directed to send a copy of this Order to the Clerk for the United States Court of Appeals for the Eleventh Circuit.

10. The *Hofmann* and *Aguilar* Plaintiffs' Joint Objections to Magistrate Judge McAliley's October 2, 2009 Laptop Mirroring Order **[DE 762]** are DENIED.

    a.  The *Hofmann* and *Aguilar* Plaintiffs are ORDERED to compensate Ikon for fifty percent of the laptop mirroring costs **no later than March 1, 2010**.

    b.  Searches of the hard drives and disclosure of any discoverable information may be requested by way of motion to Magistrate Judge McAliley.

11. The DMK Defendants' Motion to Strike the Report Following Preliminary Forensic Analysis **[DE 937]** is DENIED.

12. The DMK Defendants' Motions to Dismiss for Lack of Jurisdiction and Improper Venue **[DE 933]; [DE 935]; [DE 938]** are DENIED, as these defenses have been waived.  *See* **[July 14, 2009 Tr. 26:2 - 26:8, 28:14 - 28:18]**; **[DE 528, n.2]**; **[DE 541]** (detailing sequence of events and agreements whereby all Elliott Defendants, including DMK and De Marchena, agreed to and were bound by terms of memorandum signed by their counsel which was intended as a waiver of jurisdictional and venue defenses, but not substantive defenses such as failure to state a cause of action).

13. The Objecting Defendants shall continue complying with the Monitor Order **[DE 528]**

pending further order of this Court.  The Court reserves to initiate its own criminal contempt proceedings, subject to the results of the investigation by the United States Securities and Exchange Commission.

14.     Given this Court's referral for criminal investigation, and the investigation being conducted by the United States Securities and Exchange Commission, the parties are hereby ORDERED to file with this Court within twenty days from the date of this Order a statement of reasons why this case should or should not be stayed pending further order of this Court.  Such a stay would not affect the Monitoring Order or any contempt proceedings associated with it.

DONE AND ORDERED in Chambers at Miami, Florida at this 11th day of February, 2010.

_____
THE HONORABLE ALAN S. GOLD
UNITED STATES DISTRICT JUDGE

cc:
U.S. Magistrate Judge Chris M. McAliley
Special Master Thomas E. Scott
All counsel of record
All parties of record
Frederick and Derek Elliott via e-mail at: elliottdfc@gmail.com
Jaclinn Pullman via e-mail at: jrpull@yahoo.com